**NAACP, DeKALB COUNTY CHAPTER et al., Plaintiffs,**

v.

**STATE OF GEORGIA et al., Defendants.**

**DeKALB COUNTY LEAGUE OF WOMEN VOTERS, INC. et al., Plaintiffs,**

v.

**DeKALB COUNTY, GEORGIA, BOARD OF REGISTRATIONS AND ELECTIONS et al., Defendants.**

Civ. A. Nos. C80–128A, C80–582A.

United States District Court,
N. D. Georgia,
Atlanta Division.

June 11, 1980.

Dwight L. Thomas, Paul Robinson, Winston P. Bethel, and Henry C. Johnson, Jr., Decatur, Ga., for NAACP.

Neil Bradley, Laughlin McDonald, H. Christopher Coates, Atlanta, Ga., for League.

David F. Walbert, Atlanta, Ga., for DeKalb County Democratic Committee.

Gail C. Flake, Decatur, Ga., for DeKalb County Board of Registrations & Elections.

William Brashear, Edward R. Golden, Decatur, Ga. and Robert Lee Bailey, Jr., for defendants.

Suzette Gooch and Theodore Lee Marcus, pro se.

Before HENDERSON, Circuit Judge, and SHOOB and O'KELLEY, District Judges.

## ORDER

SHOOB, District Judge.

These consolidated cases are before this Court (as the originating court) on remand from the three-judge panel for the purpose of taking evidence. See 28 U.S.C. § 2284(b)(3). An evidentiary hearing was held before this Court on May 5, 1980, at which oral testimony was taken and various exhibits were admitted. After the hearing, the parties submitted proposed findings of facts and conclusions of law; other documents, including an affidavit by defendant Marcus, and an *amicus curiae* brief by the DeKalb County Democratic Committee, have also been filed. A transcript of the evidentiary hearing ("TR") has been prepared for use by the parties, this Court, and the other members of the panel. These have all been considered by this Court in making its Findings of Facts below.

The issue before the three-judge panel in these consolidated cases is whether the January 22, 1980 decision by defendant DeKalb County Board of Registrations and Elections not to consider any applications from persons or organizations to conduct neighborhood voter registration drives, is covered under § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, and thus whether federal preclearance of the decision is required. The facts found below are only those that are relevant to the issue whether the Board has enacted, or sought to administer, "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 . . . . ."

## FINDINGS OF FACT

### A. *Parties*

In Civil Action No. C80–128A, plaintiff National Association for the Advancement of Colored People, DeKalb County Chapter ("NAACP"), is a community organization whose application to conduct neighborhood voter registration drives for the 1980 elections was denied at the January 22, 1980 meeting of the DeKalb County Board of Registrations and Elections. TR, p. 62. In the consolidated case, Civil Action No. C80–582A, plaintiff DeKalb County League of Women Voters, Inc. ("League"), is a nonprofit corporation which promotes political responsibility through the active, informed participation of citizens in government. League's Complaint, p. 2, ¶ 3. Plaintiff League was also denied the opportunity to conduct voter registration drives on three of the four dates for which it had applied. Plaintiff League's Exhibit 2, Minutes of the Board of Registrations and Elections, 1979–80, Meeting of January 22, 1980, pp. 2–4.[1]

---

1. Plaintiff League's Exhibit 1 is the Minutes of the Board of Registrars, 1972–79. This Board was the predecessor of defendant Board of Registrations and Elections. Citations to plaintiff League's Exhibits 1 and 2 shall be made

The other named plaintiffs in Civil Action No. C80–128A are adult black electors, male and female, of DeKalb County (NAACP's Complaint, pp. 2–3); the additional named plaintiffs in Civil Action No. C80–582A are adult females, black and white, who wish to be appointed deputy registrars by defendant Board for the purpose of conducting neighborhood voter registration drives. League's Complaint, p. 2.

Defendant DeKalb County Board of Registrations and Elections ("Board") was created by state statute, 1978 Ga.Laws, p. 3677, and its members took office on July 1, 1979. This Board is responsible for the registration of electors in DeKalb County and, with respect to that function, is the successor to the DeKalb County Board of Registrars (also referred to, for convenience' sake, as "Board"). League's Complaint, p. 2, ¶ 7; Answer, p. 2, ¶ 3. *See* Ga.Code Ann. Title 34, Chapter 6. Defendants Suzette Gooch, Theodore Lee Marcus, Robert Lee Bailey, Jr., Edward R. Golden, and William M. Brashear are the five current members of the defendant Board of Registrations and Elections. League's Complaint at p. 2, ¶ 6. Each is sued individually and in his or her official capacity. Ms. Gooch is Chairperson of the Board.

B. *Voter Registration Patterns in DeKalb County*

Black people and other non-white people are registered to vote at a much lower rate than are white people in DeKalb County. The table below, current as of March 1, 1980, illustrates the disparity.

| | POPULATION | VOTING AGE POPULATION | REGISTERED VOTERS | PERCENT REGISTERED |
|---|---|---|---|---|
| white male | 154,872 | 105,440 | 85,334 | 81% |
| white female | 166,422 | 119,334 | 97,095 | 81% |
| non-white male | 85,126 | 49,213 | 10,458 | 21% |
| non-white female | 93,780 | 58,761 | 15,977 | 27% |
| | 500,200 | 332,748 | 208,864 | 63% |

Affidavit of Theodore Marcus, page 3, ¶¶ 10, 11. *Thus, better than four out of five white adults in DeKalb County are registered to vote; fewer than one in four non-white adults in DeKalb County are registered to vote.* In different terms, while non-white adults comprise over 32% of the adult population of the county, non-white electors make up less than 13% of the county's total number of electors. Thus there exists in DeKalb County significant under-registration of non-whites.

There are fewer permanent "satellite" registration points (discussed below) in South DeKalb County, which is heavily non-white, than in any other part of the county.[2] Georgia Senate District 43 is largely non-white. TR, pp. 78–79. The following table, taken from the list of satellite registration sites attached to the Affidavit of Harry E. Schmid, gives a breakdown of sites according to state Senate Districts.

| Senate District | # 43 | # 5 | # 41 | # 42 | # 55 |
|---|---|---|---|---|---|
| No. of Satellite Registration Points | 12 | 26 | 31 | 23 | 26 |

according to the following form: "Minutes, [date], p. ——."

**2.** As for the effectiveness of satellite registration, plaintiff League's complaint and defendant Board's answer reveal the following. During the month of January, 1980, at all DeKalb County voter registration sites, 2,700 people were registered. On the other hand, during a one-day voter registration drive conducted by plaintiff League on February 2, 1980, approximately one and one-half times as many people were registered. League's Complaint, p. 4, ¶ 13(b); Answer, p. 3, ¶ 7.

### C. Voter Registration Practice in DeKalb County

Until November 1, 1964, the only location at which DeKalb County citizens could register was at the DeKalb County Courthouse in Decatur. TR, p. 82.

Beginning in 1965, members of the staff of the Registrar were deputized to register voters at locations other than the County Courthouse. TR, p. 82. Also in 1965 or 1966, the City Halls of Chamblee and Stone Mountain were established as permanent voter registration sites, called "satellite locations." TR, p. 83.

Also in 1965, members of the staff of the DeKalb County Registrar's Office were deputized to conduct voter registration at other locations for limited periods of time, especially during evening hours and on weekends. TR, p. 82.

In 1972, the practice referred to in the preceding paragraph was discontinued (at least partly to save money). In lieu of that practice, two other voter registration methods developed: first, permanent registration points or "satellites," in banks, libraries, schools, city halls, etc.; and second, neighborhood voter registration drives conducted by community civic organizations. TR, pp. 83–85; Minutes, Aug. 16, 1972, p. 1; Minutes, July 18, 1974.

Despite occasional indications by the Board that there were "enough" satellite voter registration points (see, e. g., Minutes, May 10, 1972, p. 1), the numbers of such satellite sites have slowly increased over the years. There are now over 130 such satellite stations. TR, p. 84.

Mr. Harry E. Schmid has been primarily responsible for the handling of applications from community organizations to conduct voter registration drives from 1972 to the present. His testimony makes up the bulk of the transcript of the evidentiary hearing. From May, 1972 to June, 1979, Mr. Schmid was Chief Registrar of DeKalb County, Chairman of the Board of Elections and Chairman of the Board of Registrars. TR, p. 32. Since June of 1979, Mr. Schmid has held the title of Elections Supervisor for the county. TR, pp. 31–32. He is not a member of the DeKalb County Board of Registrations and Elections but he does attend their meetings.

The Minutes of the Board from 1972–80 provide the Court with a record that is less than complete. It appears that at times, the Board laid down general guidelines for the handling of registration drive requests, which were then implemented by Mr. Schmid in his capacity as Chief Registrar, subject perhaps to the Board's approval. TR, pp. 85–87. On the other hand, the Board's approval or denial of particular requests to conduct voter registration drives was at other times recorded in the Minutes. Minutes, July 18, 1974, p. 2; Minutes, March 16, 1978, p. 1; Minutes, April 20, 1978, p. 1; Minutes, May 25, 1978, p. 1. Much of the process leading to the swearing in of deputy registrars for neighborhood voter registration drives appears to have been informal, and conducted orally over the telephone or otherwise, rather than in writing. TR, p. 85. Mr. Schmid refers to pre-1980 requests for permission to conduct drives as "requests"; and to those in 1980 (filled out on Board-supplied forms) as "applications." TR, pp. 41, 95.

Several patterns should be noted concerning the Board's handling of requests to conduct registration drives. First, it appears that since 1974, the Board's policy, which Mr. Schmid conveyed to interested persons, was never to approve registration drives which individuals sought to conduct; individuals were told that, if they wished to be considered at all, they should apply as members of an organization. TR, pp. 41–42.

Second, it appears that in late 1975, the Board adopted another consistent policy of

not conducting registration drives with paid Registrar's Office personnel for candidates seeking office. Minutes, November 20, 1975, p. 1.

Third, requests to conduct registration drives were most numerous in even-numbered, general election years: 1972, 1974, 1976, 1978 and 1980. TR, p. 40.

Fourth, the policy of the Board from 1972–77 concerning registration drive requests from community groups may fairly be characterized as erratic. There are statements by Board members in the Minutes that the large number of satellite registration sites made neighborhood voter registration drives unnecessary. Minutes, April 15, 1976, p. 1. While several requests to conduct drives submitted by community groups were denied, see, e. g., Minutes, April 15, 1976, p. 1, the majority of community group requests from 1972–77 to conduct neighborhood voter registration drives were approved. TR, pp. 43–46. Nevertheless, Mr. Schmid's testimony that there was not a policy of the Board to approve every valid request for neighborhood registration, TR, pp. 94–95, is essentially correct for the years 1972–77.

While the requests of some community groups to conduct registration drives were refused, there is no evidence that either plaintiff League or plaintiff NAACP was ever turned down. See generally TR, Minutes.

Despite the inconsistent practice of the Board, a letter by Chief Registrar Schmid addressed, "To Whom It May Concern: Re: Deputy Registrars," dated October 17, 1977, purports both to describe the past policy of the Board concerning these requests, and to alter that policy. Portions of the letter are set forth below.

In the past it has been a policy of the Board of Registrars of DeKalb County to deputize upon request of organizations numbers of persons to meet at fixed locations on approved dates and times for the purpose of registering those citizens who for one reason or another had not been previously registered.

.        .        .        .        .

In as much as the number of fixed locations are now 87 in number and it is felt that these places are geographically broad, sufficiently widespread and sufficiently neighborhood oriented to care for the needs of voter registration at this time, and at no expense to the Governing Authority, that unless under very severe and unusual circumstances the Board will not deputize any deputy registrars except to replace one at the above mentioned locations.

In the event of a special need for additional deputy registrars, the Board will direct deputies from the Registrar's office to handle these services and meet unusual needs of DeKalb County citizens when the need arises.

Plaintiff NAACP's Exhibit # 7, pp. 1–2.

At the first meeting following the October 17, 1977 letter, two requests were denied. Minutes, November 17, 1977, pp. 1–2. However, from that date forward until January 22, 1980, despite the message in the letter, no requests by community organizations to conduct neighborhood voter registration drives were denied; all, including that of plaintiff NAACP, through Mr. John Evans, were approved. At the evidentiary hearing, the following exchange took place between Mr. Schmid and the Court.

THE COURT: Now from 1977 until January of 1980 you did permit these groups to register voters, without application, it was an oral type of thing?

A. Yes.

THE COURT: So for a period of approximately three years it was done as a matter of practice?

A. Yes, sir.

TR, p. 123.

The newly-constituted DeKalb County Board of Registrations and Elections apparently desired, in late 1979, to formalize "requests" to conduct neighborhood voter registration drives by community groups.[3] The following appears in the November 8, 1979 Minutes of the Board, at p. 2.

> The Chairman made the motion that (1) the Board of Registrations and Elections shall only consider applicants for registration drives when a written application is submitted, (2) a list of the people to be deputized, (3) the elections in which they will conduct registration drives and (4) proposed dates they will hold drives and then the Board will consider whether they can be deputy registrars. Mrs. Gooch seconded the motion. All were in favor with the exception of Mr. Brashear who opposed the motion.

Subsequently, an application form was prepared by the Board.[4]

The meeting of the Board on January 22, 1980 was a specially called meeting for the purpose of reviewing applications submitted by plaintiff League and plaintiff NAACP. After some discussion, the applications were denied by a 3–2 vote. This was amended later in the meeting to allow voter registration drives up until February 11, 1980, the cutoff date for registration to vote in the Presidential Preference Primary. The reasons given for the decision by the members of the Board voting to deny the applications were (1) that there were enough satellite registrations points; (2) that applicant community groups should educate potential voters rather than duplicate registration facilities, since more registration may not produce more voters; (3) that by educating rather than registering, the community groups will actually increase the percentage of adults who vote; and (4) that the drives themselves might be illegal. Minutes, January 22, 1980, pp. 1–5. It appears from the Minutes, however, that no evidence was before the Board that day as to registration or voting figures by area or race. *See generally* Minutes, January 22, 1980; TR, pp. 10, 121–22.

Prior to the January 22, 1980 meeting, the dates and locations of plaintiff League's proposed voter registration drives for 1980 had been submitted for preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, by Mr. Schmid. The Attorney General interposed no objection. Plaintiff League's Exhibit 3; TR, p. 102.

The final motion that passed the Board, and which is challenged by plaintiffs, is stated in the Minutes as follows:

> [T]hat voter registration shall be conducted only at the main office of the board of registrars and at such additional places as have been designated by the chief registrar pursuant to this Code and that public civic groups such as the League of Women Voters and N.A.A.C.P. in the future will be given an opportunity to educate to help people get out to vote rather than registration.

Minutes, January, 22, 1980, p. 5. Mr. Schmid interpreted this motion as meaning that the Board would not entertain any further applications by civic groups to conduct voter registration drives. TR, pp. 30, 62–63. Counsel for defendant Board has stipulated that the decision by the Board, not to receive any more applications, has not been submitted for preclearance under Section 5 of the Voting Rights Act. The decision itself has become a practice of the Board; Mr. Schmid has communicated the situation since January 22, 1980 to "approximately 20 different people who have called requesting to make neighborhood registrations, . . ." TR, p. 95.

SO FOUND.

See following illustration.

---

3. Two years earlier, the Board had formalized the procedure in that Mr. Schmid began to present all requests for neighborhood registration drives to the Justice Department for preclearance. Minutes, December 15, 1977, p. 1; TR, pp. 68–69.

4. A copy of the form, as completed by plaintiff NAACP, with an attached letter dated January 22, 1980, Plaintiff NAACP's Exhibit # 2, accompanies this order.

*Stipulate To:* Ct
DT 5/5/80

# NATIONAL ASSOCIATION FOR THE ADVANCEMENT
## OF COLORED PEOPLE
### DeKalb County Georgia Branch
### 2007 SECOND AVENUE
### DECATUR. GEORGIA 30032
### (404) 378.1471

**REV. NOLAN D. LEAVELL**
PRESIDENT

**MISS ESSIE P. SCRUGGS**
SECRETARY

**JOHN EVANS**
EXECUTIVE DIRECTOR

January 22, 1980

Mr. Harry E. Schmid
Elections Supervisor
DeKalb County Courthouse
Decatur, Georgia 30030

Dear Mr. Schmid:

As requested by the Board of Registrations and Elections, I am submitting the following information for your consideration for becoming Deputy Registrars:

1. List of those people to be deputized:

| | |
|---|---|
| Major Brown | Charlyne McMichael |
| John Evans | Delores Strawbridge |
| Amanda Cook | Bonita Swain |
| Roberta Copeland | Gwen Glass |
| Sarah Taylor | Marlyn Brown |
| June Crawford | Roberta Scott |

2. Proposed dates and time of day:

February 9, 1980 thru October 4, 1980
Every Saturday from 10:00 a.m. — 7:00 p.m.

Page 2

3. Proposed locations:

Zayre - Candler Road

K. Mart - Greshmon Road

Sears - Columbus Mall

South DeKalb Mall

Thanking you in advance for your consideration of this request.

Very truly yours,

Requirements for Consideration for
Becoming Deputy Registrars
(as Directed by Board of Registrations and Elections)

APPLICATION

1. List of those people to be deputized.
   (Please Attach)

2. Proposed dates and time of day.
   (Please Attach)

3. Proposed locations.
   (Please Attach)

4. Name of Organization.
   DeKalb Branch NAACP

5. Name of person to be responsible for drive.
   Major Brown

6. Elections for which voter registration drive is to be held.
   March 11, Primary, August 12, Election, November General Elections

Consideration of this written application was given

this_____day of_____, 1980.

Approved_____    Disapproved_____

DeKalb County Board Members:

_____

_____

_____

_____

_____

. All persons deputized will _only_ be deputy registrars for the above named drive.

_____

## ORDER

This Three-Judge Court, with the consent of all parties, remanded these consolidated cases to the originating court for the purpose of taking evidence. The Findings of Fact by the originating court (Judge Marvin H. Shoob) are adopted by and made the findings of this Court.

## CONCLUSIONS OF LAW

1. Both of these cases are actions for declaratory and injunctive relief brought under § 5 of the Voting Rights Act of 1965 ("Act"), 42 U.S.C. § 1973c. Plaintiffs ask this Three-Judge Court to declare that the January 22, 1980 decision by defendant Board not to consider any further applications by community organizations to conduct neighborhood voter registration drives, is a covered change under § 5 of the Act requiring federal preclearance. Plaintiffs also ask this Court to enjoin defendant Board from implementing this change in practice concerning voter registration. The Court concludes that a three-judge panel has been properly convened in, and has jurisdiction of, both of these cases. 42 U.S.C. § 1973c; 28 U.S.C. § 2284.

(a) Plaintiffs, private litigants, are entitled to invoke the jurisdiction of this Three-Judge Court under § 5 of the Act. *Allen v. State Board of Elections*, 393 U.S. 544, 554–57, 89 S.Ct. 817, 826–27, 22 L.Ed.2d 1 (1969).

(b) Defendant DeKalb County Board of Registrations and Elections is an arm of DeKalb County, a political subdivision of the State of Georgia. Georgia has been designated a covered jurisdiction pursuant to § 4 of the Act, 42 U.S.C. § 1973b. 30 Fed.Reg. 9897 (August 7, 1965); *Dougherty County, Georgia, Board of Education v. White*, 439 U.S. 32, 34, n. 2, 99 S.Ct. 368, 370, n. 2, 58 L.Ed.2d 269 (1978). Defendant Board is a "political subdivision" within the meaning of the Act. *United States v. Board of Commissioners of Sheffield, Alabama*, 435 U.S. 110, 118, 98 S.Ct. 965, 972, 55 L.Ed.2d 148 (1978) ("political subdivision" under § 5 of the Act encompasses "all entities having power over any aspect of the electoral process within designated jurisdictions" including counties or "whatever units of state government perform the function of registering voters").

2. Regardless of whether the confused practice of the Board from 1972–77 amounted to a consistent policy or procedure of any sort, this Court concludes that from 1978 until January 22, 1980 there ex-

isted a consistent voting "practice," as the term is used in § 5 of the Act, for the Board routinely to grant requests by bona fide community organizations to conduct neighborhood voter registration drives. The practice would have been formalized into a written procedure by the preparation and use of application forms had the Board not made its January 22, 1980 decision.

3. Based on the language of § 5 and the applicable case law, this Court concludes that the decision by the Board, not to consider any future applications by community groups to conduct neighborhood voter registration drives, is a covered enactment with respect to voting practice in DeKalb County different from that previously in force. The decision must receive federal preclearance from the Attorney General or from a three-judge panel of the United States District Court for the District of Columbia before it can be enforced.

(a) Defendant Board makes the novel argument that since the "standard, practice, or procedure" in effect before the January 22, 1980 Board decision was not "in force or effect on November 1, 1964," the Board decision is not within the precise terms of § 5 coverage. It is true that the exact language of the statute would support defendant's reading of § 5. However, defendant's interpretation is wrong for three reasons.

(i) It would lead to a result tantamount to repeal of the Act. If defendant's reading were correct, a covered state or subdivision thereof could amend its laws concerning voting and receive the Attorney General's approval, then change its laws back to the way they were before, avoiding federal preclearance on the ground that the voting laws approved by the Attorney General previous to the most recent change were not "in force or effect on November 1, 1964."

(ii) The Attorney General reached no such conclusion. *See* 28 C.F.R. § 51.4. The opinion of the Attorney General in his administration of the Voting Rights Act is entitled to great deference. *See Perkins v. Matthews*, 400 U.S. 379, 390–91, 91 S.Ct. 431, 438, 27 L.Ed.2d 476 (1971). The Pro-

posed Regulations of the Attorney General of March 21, 1980 are even clearer on the point. 45 Fed.Reg. 18890, 18891–92, 28 C.F.R. § 51.4(b).

(iii) The Congress intended no such result. The legislative history of the Voting Rights Act of 1965, "on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way." *Allen v. State Board of Elections, supra*, 393 U.S. at 566, 89 S.Ct. at 832. This is just the sort of loophole which the Congress, by employing such sweeping language in the Act, intended to foreclose to covered states and their political subdivisions.

(b) While no cases are directly controlling, the language of the statute and its legislative history, the regulations and proposed regulations issued by the Attorney General, the cases and their holdings indicate that even minor, indirect changes concerning voting in covered jurisdictions must be precleared.

(i) The language of § 5 is extremely broad. A covered change occurs when a state or subdivision of the state "enact[s] or seek[s] to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting . . . ." The words "vote" and "voting" are likewise broadly defined as including "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, . . . ." 42 U.S.C. § 1973*l* (c)(1).

(ii) The Attorney General has broadly construed the Act in accordance with Congressional intent. Preclearance by the Attorney General or the District Court for the District of Columbia is required for "[a]ll changes affecting voting, even though the change appears minor or indirect, to expand voting rights or to remove the elements which caused objection by the Attorney General to a prior submission . . . ." 28 C.F.R. § 51.4(a). Moreover,

Legislation and administrative actions constituting changes affecting voting covered by section 5 include . . . (2) Any change in procedures concerning registration, balloting, or informing or assisting citizens to register and vote;

28 C.F.R. § 51.4(c). The decision of defendant Board is a change in procedure concerning registration or "assisting citizens to register and vote."

Proposed Rules by the Attorney General make it even clearer that the change at issue here is one within the broad scope of § 5 of the Act. *See* 45 Fed.Reg. 18890, 18892, §§ 51.12(b), 51.13(2), (3) (March 21, 1980) (covered changes include "any change concerning publicity for or assistance in registration or voting"). Although these regulations are not yet in effect, the Supreme Court has said that "[g]iven the central role of the Attorney General in formulating and implementing § 5, this interpretation of its scope is entitled to particular deference." *Dougherty County, Georgia, Board of Education v. White, supra,* 439 U.S. at 39, 99 S.Ct. at 373.

(iii) Among the changes found by the Supreme Court to be covered under § 5 of the Act [1] are the following:

—a change from district to at-large voting for county supervisors, *Allen v. State Board of Elections, supra,* 393 U.S. at 569, 89 S.Ct. at 833–34;

—a change from electing to appointing an important county officer in certain counties, *Allen v. State Board of Elections, supra,* 393 U.S. at 569–70, 89 S.Ct. at 834;

—an amendment to balloting procedure which provides that "no person who has voted in a primary election may thereafter be placed on the ballot as an independent candidate in the general election," *Allen v. State Board of Elections, supra,* 393 U.S. at 570, 89 S.Ct. at 834;

—a new procedure for casting write-in votes, *Allen v. State Board of Elections, supra,* 393 U.S. at 570, 89 S.Ct. at 834;

—a change in the location of polling places, *Perkins v. Matthews, supra,* 400 U.S. at 387, 91 S.Ct. at 436;

—municipal annexations, *Perkins v. Matthews, supra,* 400 U.S. at 388, 91 S.Ct. at 437;

—the change from ward to at-large elections of city aldermen, *Perkins v. Matthews, supra,* 400 U.S. at 394, 91 S.Ct. at 439–40;

—a state statute which staggered the terms of the three members of a county Board of Commissioners of Roads and Revenues, *Berry v. Doles,* 438 U.S. 190, 191, 98 S.Ct. 2692, 2694, 57 L.Ed.2d 693 (1978);

—a city's decision to change from an aldermanic system of government to a system in which councilmen are elected at large, *United States v. Board of Commissioners of Sheffield, Alabama, supra,* 435 U.S. at 110, 98 S.Ct. at 983; and

—a rule by a county board of education requiring employees to take unpaid leaves of absence while campaigning for public office, *Dougherty County, Georgia, Board of Education v. White, supra,* 439 U.S. at 47, 99 S.Ct. at 377.

---

1. While this Court is not required to decide whether the voting change had either a discriminatory purpose or effect, *Dougherty County, Georgia, Board of Education v. White,* 439 U.S. at 36, 99 S.Ct. at 371, the Supreme Court has stated the issue of § 5 coverage to be whether the change "had the 'potential' for discrimination and hence was subject to § 5." *Dougherty County, Georgia, Board of Education v. White,* 439 U.S. at 36, 99 S.Ct. at 371. *See also Georgia v. United States,* 411 U.S. 526, 534, 93 S.Ct. 1702, 1707, 36 L.Ed.2d 472 (the issue is "whether such changes have the potential for diluting the value of the Negro vote and are within the definitional terms of § 5"). This Court does not understand the two standards to be equivalent. *See Dougherty County, Georgia, Board of Education v. White,* 439 U.S. 49–51, 99 S.Ct. at 378 (Powell, J., dissenting). Nevertheless, it is clear to this Court that the decision not to allow any more neighborhood voter registration drives is one which has "potential for discrimination." This is particularly so in light of the underregistration of non-white voters in DeKalb County. Thus, whether the decision at issue here is evaluated under the wording of § 5 itself or under the 'potential for discrimination' standard, it falls within § 5 coverage.

In dicta, the Supreme Court has further offered the opinion of the Attorney General that a mere change in the place of registration would fall within § 5 coverage. *Perkins v. Matthews, supra,* 400 U.S. at 387, 91 S.Ct. at 436.

This Court concurs in the plaintiff League's summary of the cases: "in not one instance has the Supreme Court ever held that any type of change is too minor" for § 5 coverage. Both the opinion of the Supreme Court (Marshall, J.) and the dissenting opinion (Powell, J.) in *Dougherty County, Georgia, Board of Education v. White, supra,* fully discuss the extremely broad scope of § 5 of the Act.

### RELIEF

Having found that the decision of defendant Board falls within § 5 coverage, the Court GRANTS plaintiffs' motion for a preliminary injunction. Defendant Board is ENJOINED from further implementation of its January 22, 1980 decision until the Board receives the required federal preclearance under § 5 of the Voting Rights Act of 1965.

### OTHER MATTERS

All parties have consented to the motion of the City of Decatur and related defendants to sever Count II of the NAACP complaint (C80–128A) from the remaining counts. It appears that it would be more appropriate for Count II to be brought as a separate suit since (1) a three-judge panel is not required and (2) Count II is not related to the remaining counts. Accordingly, Count II of the complaint is DISMISSED without prejudice to plaintiffs' right to re-file it as a separate case. If Count II is re-filed, it should be assigned by the Clerk of the Court to the originating judge in this three-judge panel case.

Count III of the NAACP complaint is a challenge to the way districts are drawn and elections are conducted for the DeKalb County Board of Education. Plaintiffs ask this Court to find that the 1966 Georgia law changing the Board of Education districts required preclearance under § 5 of the Vot-

ing Rights Act. Counsel for defendant Board of Education has informed the Court that the change mandated by the 1966 law has now been submitted to the Attorney General and that the Attorney General will not object. Since § 5 coverage was the only issue in Count III requiring the attention of a three-judge panel, any remaining claims in Count III are appropriate for adjudication by the originating judge.

IT IS SO ORDERED.