John E. WHITE, Plaintiff,

v.

**DOUGHERTY COUNTY BOARD OF EDUCATION, et al., Defendants.**

Civ. A. No. 81–20–ALB.

United States District Court,
M.D. Georgia,
Albany Division.

Feb. 10, 1984.

Jesse W. Walters, Albany, Ga., for defendants.

John R. Myer, Atlanta, Ga., for plaintiff.

Before ANDERSON, Circuit Judge, and OWENS and ELLIOTT, District Judges.

OWENS, District Judge:

In 1976 plaintiff John E. White, a black Albany, Georgia citizen and employee of the Dougherty County Board of Education, filed a previous complaint (Civil 76–29 Albany Division) in this court alleging that defendant board of education's Rule 58 requiring any school system employee who becomes a candidate for public office to take a leave of absence without pay for the duration of his candidacy, was violative of the Voting Rights Act; the Voting Rights Act had not been complied with; and use of the rule should be enjoined by a three-judge court until the Voting Rights Act was complied with. By order dated March 27, 1977, the required three-judge court agreed with plaintiff White and in a written opinion published in 431 F.Supp. 919 enjoined the use of Rule 58 until the Voting Rights Act was complied with. Defendant Dougherty County Board of Education appealed to the Supreme Court of the United States and the Supreme Court on November 28, 1978, in a 5–4 decision affirmed. 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269.

On March 10, 1981, plaintiff John E. White filed the subject complaint against the Dougherty County Board of Education alleging that on or about April 15, 1980, the board of education, after abolishing the rule that was enjoined, adopted a new political leaves of absence policy which expressly denies employee leaves of absence for political purposes; that said policy violates the Voting Rights Act; the Voting Rights Act has not been complied with; and a court of three judges should enjoin use of the policy until the Act is complied with. A court of three judges was designated, and a hearing was held. All having been considered, this constitutes the court's ruling on all issues required to be decided by a court of three judges. 42 U.S.C. 1971(g).

*The Facts*

This being a continuation of the events that precipitated plaintiff's first lawsuit, the facts begin with those events. They were stipulated to and, as stipulated, set forth in the court's order of March 27, 1977, to wit:

[T]he plaintiff John E. White, a black citizen of Dougherty County, Georgia, filed his complaint alleging that in May 1972 while employed by the Dougherty County Board of Education, he publicly announced his intention to become a candidate for a seat in the House of Representatives of the General Assembly of Georgia. Plaintiff White states that he thus became the first black in recent years to seek election in Dougherty County as a Representative to the General Assembly. In June 1972 the defendant Dougherty County Board of Education for the first time adopted the following policy known as Rule 58:

"POLITICAL OFFICE. Any employee of the school system who becomes a candidate for any elective political office, will be required to take a leave of absence, without pay, such leave becoming effective upon the qualifying for each elective office and continuing for the duration of such political activity, and during the period of service in such office, if elected thereto."

As required by this rule the plaintiff took a leave of absence without pay from the time of his qualification as a Democratic primary candidate in June 1972 until his defeat in the Democratic primary election in August 1972. In June 1974 he again qualified to run for the same office and was required to take a leave of absence from his employment on June 12, through and including his winning the August 1974 primary election and the November 1974 general election. Following the general election of November 5 he was reinstated in his employment on November 18, 1974. The court has not been advised whether or not he had opposition in the general election. On June 8, 1976, he again qualified to run for the same office and was required to take a leave of absence without pay through and including the August 1976 Democratic primary election. He won that election, did not have opposition in the general election, and was reinstated to his employment on September 8, 1976, preceding the November general election. Plaintiff's affidavit shows that as a result of these leaves of absence without pay, he was deprived of the following amounts of monetary compensation:

| | |
|---|---|
| 1972 | $2,810.00 |
| 1973 | 4,780.00 |
| 1976 | 3,750.00 |

Rule 58 has not been submitted for United States District Court for the District of Columbia judicial approval or to the Attorney General for him to have the opportunity to disapprove, all pursuant to Section Five....

431 F.Supp. at 921.

*Additional Facts as Found by this Court*

John White is, and for 17 years has been, employed as an Assistant Coordinator of Student Personnel Services at the Albany Area Vocational Technical School. The vocational school operates during the day and the evening throughout the entire year. Mr. White's responsibilities include admissions, records, counseling, and testing, and require him to be on the job throughout the entire year. His workday Monday through Thursday begins at 2:30 p.m. and ends at 10:30 p.m., except on Tuesday when it ends at 9:30 p.m. On Friday he works from 8:00 a.m. to 4:00 p.m. His employment contract is a twelve-month contract and, among other things, provides that his "annual salary shall be subject to an adjustment on a pro rata basis for the number of days the employee does not work ... due to ... employee's absence when there is no accumulative leave to cover such absence." (Def. Ex. 5).

Before, during, and after the time that Rule 58 was in effect the Dougherty County Board of Education, as a matter of policy applicable to all employees, permitted each employee during the year to be absent from the job without loss of compensation for vacation, sickness, and other reasons. As of April 15, 1980, the date requests for political leave without pay were denied, that policy allowed all employees to be absent with pay for the following:

(a) Jury duty—* [1]

(b) Vacation—ten days

(c) Personal leave—three days

(d) Sick leave—* [1]

(e) Military leave—* [1]

(f) Maternity leave—* [1]

Further use of Rule 58 was enjoined by this court on March 27, 1977. The defendant board appealed to the Supreme Court of the United States but also rescinded the rule on April 11, 1977. Mr. White thereafter requested and the defendant board of education granted a leave of absence without pay for the time Mr. White was required to be in Atlanta attending the 1978 session of the Georgia General Assembly— 40 days during January, February, and March. This leave of absence had no effect upon his normal leaves of absence with pay.

In the November, 1978, general election Mr. White was reelected. Earlier that year

---

**1.** Since this controversy does not involve either jury duty, sick, military, or maternity leave, the details are irrelevant and omitted.

the board of education had adopted a policy which stated:

### WORK SCHEDULE

It shall be the policy of the Dougherty County School Board that each employee fulfill his/her contract in its entirety. That is, each ten (10) month employee shall fulfill his/her contract during the regular academic school year (August-June).

Because an eleven (11) month contract can not be completed in its entirety during the regular academic school year an agreement between the employee and the Superintendent will determine when the additional month will be completed.

Twelve (12) month employees will be expected to work the entire twelve months except for vacation time.

Approved 1978

(Def. Ex. 11).

In response to Mr. White's request that he be allowed to be absent without pay during the 1979 and 1980 legislative sessions the defendant board met on November 20, 1978, and took the following action:

After some discussion of the matter, Mr. Sumter made a motion, which was seconded by Mr. Murphy that the Board reaffirm its position concerning employees fulfilling their contracts in their entirety.

The Board so directed the Superintendent to notify Mr. John White, Mrs. Lillian Parkman [2] and Mr. Don Cutler,[3] the three school employees elected to political offices, of the Board's decision. (footnotes added)

(Def. Ex. 1).

As directed, Superintendent Robertson notified Mr. White and also advised him, Mrs. Parkman, and Mr. Cutler that the board desired to meet with them and discuss the question of how they each could perform their board of education job responsibilities and also serve in their elected offices. On December 20, 1978, that meeting was held. Mr. White was advised that if his request for leave without pay to

serve in Atlanta during the upcoming legislative session was granted, a study of the effect of such leave on his job performance would be made over the next two years, and the question would be reconsidered in light of that study. After a great deal of discussion the board, by a four to three vote, allowed leave without pay. (Pl. Ex. 7). The Superintendent then promulgated administrative regulations requiring at least three days notice of a request for leave and approval thereof in advance. (Pl. Ex. 1).

Following the conclusion of the 1980 legislative session the board met on April 15, 1980, and, as promised, again discussed the question of leaves of absence without pay for political purposes. Superintendent Robertson reported that the two-year study showed that the leave without pay policy was having an adverse or harmful effect upon Mr. White's job performance and recommended that further leave without pay for political purposes be denied. By a vote of five to one the Superintendent's recommendation was adopted.

Mr. White served in the general assembly using personal leave and vacation time to account for his absences from the job and limiting his appearances in the legislature to the most essential portions of the forty-day session.

On November 26, 1980, Mr. White again requested leave without pay to serve from January 12 to March 6, 1981, in the Georgia General Assembly. On December 15, 1980, the defendant board, "after a discussion of the effect of his absences from his position at the Albany Area Vocational Technical School, voted to deny his request...." (Pl. Ex. 6).

On December 31, 1980, plaintiff's attorney re-entered the picture and contended by letter that the board's denial of Mr. White's leave without pay is a current policy that is unenforceable until Section 5 clearance has been obtained. The defendant board's attorney was of the opposite view.

---

**2.** Mrs. Parkman was also an elected State Representative.

**3.** Mr. Cutler was an elected County Commissioner.

Plaintiff's attorney contacted the Civil Rights Division of the Department of Justice and by letter dated February 11, 1981, the Chief of the Voting Section advised defendant's attorney:

It has come to our attention that the Dougherty County Board of Education may have changed its policy on political leaves of absence for employees of the school system.

Our records fail to show that this *possible change* affecting voting has been submitted to the United States District Court for the District of Columbia for judicial review or to the Attorney General for administrative review as required by Section 5 of the Voting Rights Act of 1965, as amended. It is necessary that a change either be brought before the District Court for the District of Columbia or submitted to the Attorney General for a determination that the change does not have the purpose and will not have the effect of discriminating on account of race, color or membership in language minority group. Changes in procedure which affect voting are unenforceable unless and until the Section 5 preclearance requirements have been met.

Should you elect to submit this *apparent change* to the Attorney General, please follow the procedures set forth in the enclosed Procedures for the Administration of Section 5. In addition, *please provide us with a description of the practices or policies* which have been in effect concerning granting, or not granting, leaves of absence, with or without pay, etc., since November 1, 1964, for political activity by employees of the Board of Education. (emphasis added).

\* \* \* \* \* \*

(Pl.Ex. 10).

By letter dated February 18, 1981, defendant board's attorney advised the Civil Rights Division of the Department of Justice:

The Dougherty County Board of Education has no policy on political leaves of absence for employees of the school system. Personnel who are under contract with the Dougherty County School System are expected to fulfill their contracts and give to the school system their full attention and energies. This applies to all contract personnel.

The Dougherty County School System did have a rule at one time pertaining to leaves of absence for political candidates. However, the Supreme Court for the United States in the case of *Dougherty County Board of Education v. White*, 439 U.S. 32, 58 L.Ed.[2d] 269, 99 S.Ct. 368 (1978), held that such rule was in violation of Section 5 of the Voting Rights Act of 1965. Since and prior to that date the Dougherty County School System has had no policy regarding political leaves of absence for employees of the school system. All employees are dealt with in the same fashion concerning leaves of absence.

(Pl.Ex. 11).

On March 10, 1981, this second complaint was filed. Thereafter the attorneys continued to assert their respective contentions by letters, responsive pleadings, and argument—oral and written—to this court of three judges convened pursuant to the Voting Rights Act and 28 U.S.C. § 2284.

Mr. White at each general election has been re-elected as a state representative. By using his personal and vacation leave with pay time he has continued to serve in his elected office and to be a full-time employee of the defendant board of education. The defendant board of education has continued to refuse to grant Mr. White leave without pay during the annual 40-day legislative session in effect requiring him to abide by the personnel leave policies applicable to him in common with all other employees.

If Mr. White were permitted leave without pay, he estimates he would be absent from his job approximately 45 school days each year. The area vocational school is in session approximately 208 days each year. Not counting leave with pay time, Mr. White would thus be absent some 45 of 208 days—approximately 21% of the work year. Counting leave with pay time of a minimum of 10 days vacation plus three days

personal leave, Mr. White would be absent some 58 of 208 days—approximately 28% of the work year.

The defendant board is requiring all employees to abide by its leave with pay policies. Although its stated intention is to deny all future requests for political leave, the board urges that its practice is to consider requests for leave for other purposes, including political leave, on a case-by-case basis. As a practical matter, all Mr. White's requests for leave without pay to attend to the duties of an elective office have been denied. It is thus the policy and practice of the defendant board of education to deny its employees requests for leaves of absence without pay to attend to the duties of elective office and in so doing to require its employees holding elective office to abide by the same leave policies that are applicable to all employees.

### The Law

As the three-judge court that decided the parties' first controversy stated:

In 1965 Congress enacted the Voting Rights Act to eliminate the racial discrimination in voting that Congress believed to still exist in a minority of the states of these United States, chiefly those in the traditional South. As contemplated, only eleven states were brought within the coverage[1] of the Act—South Carolina, Alabama, Alaska, Georgia, Louisiana, Mississippi, Virginia, twenty-six counties in North Carolina, three counties in Arizona, one county in Hawaii, and one county in Idaho. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

Section Five of the Act, 42 U.S.C.A. § 1973c, provides that whenever a covered state or political subdivision "shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964..." it may not utilize or implement such change until (a) it has secured a judicial determination in the U.S. District Court for the District of Columbia that the change does not have the purpose or effect of denying the right to vote on account of race or (b) it has submitted such change to the Attorney General of the United States and the Attorney General has not interposed an objection within sixty days. While the Act does not specifically provide for a remedy for failure to comply with Section Five, the Supreme Court has held that a complaint for injunctive relief to be heard by a district court of three judges may be filed in any U.S. District Court and that court if it is shown that Section Five applies must enjoin the utilization or implementation of such change until Section Five is complied with. *Allen v. Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

\*    \*    \*    \*    \*    \*

This district court of three judges is required to resolve any dispute as to the coverage of Section Five or, said more directly, to determine "whether such changes have the potential for diluting the value of the Negro vote and are within the definitional terms of § 5." *Georgia v. United States,* 411 U.S. 526, 534, 93 S.Ct. 1702, 1707, 36 L.Ed.2d 472, 481 (1973). The question of coverage to be decided by this court does not include the ultimate question required by Section Five to be presented to the District Court for the District of Columbia or the Attorney General, i.e., whether or not the enactment in truth and fact has a discriminatory purpose or effect. *Perkins v. Matthews,* 400 U.S. 379, 383, 91 S.Ct. 431, 434, 27 L.Ed.2d 476, 482 (1971).

---

[1] As originally enacted, the law was to apply "in any State or in any political subdivision of a state which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 percentum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 percentum of such persons voted in the presidential election of November 1964." 42 U.S.C.A. Sec. 1973b(b).

The appropriate determinations subjecting Georgia and its political subdivisions to the Act were made on August 6, 1965, and published in

the Federal Register on August 7, 1965. 30 Fed.Reg. 9897.

431 F.Supp. at 920–22.

In its decision of the parties prior case the Supreme Court set forth its view of the coverage of Section Five:

Section 5 provides that whenever a covered State or political subdivision "shall enact or seek to administer any voting qualification or prerequisite to voting, or *standard, practice*, or *procedure* with respect to voting different from that in force or effect on November 1, 1964," it may not implement that change until it either secures a determination from the District Court for the District of Columbia that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or submits the change to the Attorney General and he interposes no objection within 60 days. [42 USCS § 1937c] (emphasis added). Although § 14(c)(1) expansively defines the term "voting" to "include all action necessary to make a vote effective," 79 Stat. 445, 42 U.S.C. § 1973(c)(1) [42 USCS § 1973(c)(1), the Act itself nowhere amplifies the meaning of the phrase "standard, practice, or procedure with respect to voting." Accordingly, in our previous constructions of § 5, we have sought guidance from the history and purpose of the Act.

### A

This Court first considered the scope of the critical language of § 5 in *Allen v. State Board of Elections*, 393 U.S. 544, 22 L.Ed.2d 1, 89 S.Ct. 817 (1969), involving consolidated appeals in three cases from Mississippi and one from Virginia. After canvassing the legislative history of the Act, we concluded that Congress meant "to reach any state enactment which altered the election law of a covered State in even a minor way." 393 U.S., at 566, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 832].[5] Conceived after "nearly a century of systematic resistance to the Fifteenth Amendment," *South Carolina v. Katzenbach*, 383 U.S. 301, 328, 15 L.Ed.2d

769, 86 S.Ct. 803 [818] (1966),[6] the Voting Rights Act was, as Allen emphasized, "aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." 393 U.S. at 565, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 831] (footnote omitted). To effectuate the 'articulated purposes of the legislation,' id., at 570, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 834], the Allen Court held that the phrase "standard, practice, or procedure" must be given the "broadest possible scope," id., at 567, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 832], and construed it to encompass candidate qualification requirements. Id., at 570, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 834] (*Whitley v. Williams*, companion case decided with *Allen*, supra). The Court concluded that any enactment which burdens an independent candidate by "increasing the difficulty for [him] to gain a position on the general election ballot" is subject to § 5 since such a measure could "undermine the effectiveness" of voters who wish to elect nonaffiliated representatives. Ibid.

In subsequent cases interpreting § 5, we have consistently adhered to the principles of broad construction set forth in *Allen*. In *Hadnott v. Amos*, 394 U.S. 358, 22 L.Ed.2d 336, 89 S.Ct. 1101 (1969), this Court held that an Alabama statute requiring independent candidates to declare their intention to seek office two months earlier than under prior procedures imposed "increased barriers" on candidacy and therefore warranted § 5 scrutiny, 394 U.S., at 366, 22 L.Ed.2d 336, 89 S.Ct. 1101 [at 1105]. Similarly, in contexts other than candidate qualification, we have interpreted § 5 expansively to mandate preclearance for changes in the location of polling places; *Perkins v. Matthews*, supra; alterations of municipal boundaries, *Richmond v. United States*, 422 U.S. 358, 45 L.Ed.2d 245, 95 S.Ct. 2296 (1975); *Petersburg v. United States*, 410 U.S. 962, 35 L.Ed.2d 698, 93 S.Ct. 1441 (1973), summarily affg 354 F.Supp. 1021 (DC 1972); *Perkins v. Matthews*, supra; and reapportionment and

redistricting plans, *Georgia v. United States,* supra.

Had Congress disagreed with this broad construction of § 5, it presumably would have clarified its intent when re-enacting the statute in 1970 and 1975. Yet, as this Court observed in *Georgia v. United States,* [411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472], "[a]fter extensive deliberations in 1970 on bills to extend the Voting Rights Act, during which the Allen case was repeatedly discussed, the Act was extended for five years, without any substantive modification of § 5." 411 U.S., at 533, 36 L.Ed.2d 472, 93 S.Ct. 1702 [at 1707] (footnote omitted). Again in 1975, both the House and Senate Judiciary Committees, in recommending extension of the Act, noted with approval the "broad interpretations to the scope of Section 5" in *Allen* and *Perkins v. Matthews.* S.Rep. No. 94–295, p. 16 (1975) (hereinafter S.Rep.); HR Rep. No. 94–196, p. 9 (1975) (hereinafter HR Rep). Confirming the view of this Court, the Committee Reports stated, without qualification, that "[s]ection 5 of the Act requires review of *all* voting changes prior to implementation by the covered jurisdictions." S.Rep. 15; HR Rep. 8 (emphasis added).

The Attorney General's regulations, in force since 1971, reflect an equally inclusive understanding of the reach of § 5. They provide that "[a]ll changes affecting voting, even though the change appears to be minor or indirect," must be submitted for prior approval. 28 CFR § 51.4(a) (1977). More particularly, the regulations require preclearance of "[a]ny alteration affecting the eligibility of persons to become or remain candidates or obtain a position on the ballot in primary or general elections or to become or remain officeholders." § 51.-4(c)(4). Pursuant to these regulations, the Attorney General, after being apprised of Rule 58, requested its submission for § 5 clearance.[7] Given the central role of the Attorney General in formulating and implementing § 5, this interpretation of its scope is entitled to particular deference. *United States v.*

*Board of Comm'rs of Sheffield,* 435 U.S., [110] at 131, 55 L.Ed.2d 148, 98 S.Ct. 965 [at 979]; *Perkins v. Matthews,* supra, [400 U.S.] at 391, 27 L.Ed.2d 476, 91 S.Ct. 431 [at 438]. See *Georgia v. United States,* 411 U.S., at 536–539, 36 L.Ed.2d 472, 93 S.Ct. 1702 [at 1708–1710].

---

[5] For example, we noted that Attorney General Katzenbach, who played a substantial role in drafting the Act, testified that the term "practice' in § 5 was intended to be all inclusive ...." Hearings on S 1564 before the Senate Committee on the Judiciary, 89th Cong. 1st Sess. 192 (1965), quoted in *Allen v. State Board of Elections,* supra, [393 U.S.] at 566–567, and n. 31, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 832–833, and n. 31].

[6] The protean strategies of racial discrimination that led Congress to adopt the Voting Rights Act have been often discussed by this Court. See *United States v. Board of Comm'rs of Sheffield,* 435 U.S. 110, 118–121, 55 L.Ed.2d 148, 98 S.Ct. 965 [972–974] (1978); *South Carolina v. Katzenbach,* 383 U.S. at 308–315, 15 L.Ed.2d 769, 86 S.Ct. 803 [at 808–811], and need not be reviewed here.

[7] Shortly before the commencement of this litigation, counsel for appellate brought Rule 58 to the attention of the Civil Rights Division of the Department of Justice. Two and one-half months after appellee filed his complaint. Assistant Attorney General Pottinger informed the Superintendent of the Dougherty County School System that Rule 58 should be submitted for preclearance. Appellants made no response.

In applying those views to Rule 58 and concluding that Rule 58 was a change within the definitional terms of Section 5 and having the potential for diluting the value of the Negro vote, the Supreme Court further explained its views:

Despite these consistently expansive constructions of § 5, appellants contend that the Attorney General and District Court erred in treating Rule 58 as a "standard, practice, or procedure with respect to voting" rather than as simply "a means of getting a full days work for a full days pay—nothing more and nothing less." Brief for Appellants 20. In appellants' view, Congress did not intend to subject all internal personnel measures affecting political activity to federal superintendence.

The Board mischaracterizes its policy. Rule 58 is not a neutral personnel practice governing all forms of absenteeism. Rather, it specifically addresses the electoral process, singling out candidacy for elective office as a disabling activity. Although not in form a filing fee, the Rule operates in precisely the same fashion. By imposing substantial economic disincentives on employees who wish to seek elective office, the Rule burdens entry into elective campaigns and, concomitantly, limits the choices available to Dougherty County voters. Given the potential loss of thousands of dollars by employees subject to Rule 58, the Board's policy could operate as a more substantial inhibition on entry into the elective process than many of the filing-fee changes involving only hundreds of dollars to which the Attorney General has successfully interposed objections. That Congress was well aware of these objections is apparent from the Committee Reports supporting extension of the Act in 1975. S.Rep. 16–17; HR Rep. 10.

In *Georgia v. United States,* we observed that "[s]ection 5 is not concerned with a simple inventory of voting procedures, but rather with the reality of changed practices as they affect Negro voters." 411 U.S., at 531, 36 L.Ed.2d 472, 93 S.Ct. 1702 [at 1706]. The reality here is that Rule 58's impact on elections is no different from that of many of the candidate qualification changes for which we have previously required preclearance. See *Hadnott v. Amos,* 394 U.S. 358, 22 L.Ed.2d 336, 89 S.Ct. 1101; *Allen,* 393 U.S. at 551, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 824].[10] Moreover, as a practical matter, Rule 58 implicates the political process to the same extent as do other modifications that this Court and Congress have recognized § 5 to encompass, such as changes in the location of polling places, *Perkins v. Matthews,* and alterations in the procedures for casting a write-in vote, *Allen v. State Board of Elections,* supra.

We do not, of course, suggest that all constraints on employee political activity affecting voter choice violate § 5. Pre-sumably, most regulation of political involvement by public employees would not be found to have an invidious purpose or effect. Yet the same could be said of almost all changes subject to § 5. According to the most recent figures available, the Voting Rights Section of the Civil Rights Division processes annually some 1,800 submissions involving over 3,100 changes and interposes objections to less than 2%. Attorney General Ann Rep 159–160 (1977). Approximately 91% of these submissions receive clearance without further exchange of correspondence. Tr. of Oral Arg 53. Thus, in determining if an enactment triggers § 5 scrutiny, the question is not whether the provision is in fact innocuous and likely to be approved, but whether it has a *potential* for discrimination. See *Georgia v. United States,* supra, [411 U.S.] at 534, 36 L.Ed.2d 472, 93 S.Ct. 1702 [at 1707]; *Perkins v. Matthews,* 400 U.S., at 383–385, 27 L.Ed.2d 476, 91 S.Ct. 431 [at 434–435]; *Allen v. State Board of Elections,* supra, [393 U.S.] at 555–556, n. 19, 558–559, 570–571, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 826–827, n. 19, 828, 834–835].

Without intimating any views on the substantive question of Rule 58's legitimacy as a nonracial personnel measure, we believe that the circumstances surrounding its adoption and its effect on the political process are sufficiently suggestive of the potential for discrimination to demonstrate the need for preclearance. Appellee was the first Negro in recent years to seek election to the General Assembly from Dougherty County, an area with a long history of racial discrimination in voting.[11] Less than a month after appellee announced his candidacy, the Board adopted Rule 58, concededly without any prior experience of absenteeism among employees seeking office. That the Board made its mandatory leave-of-absence requirement contingent on candidacy rather than on absence during working hours underscores the Rule's potential for inhibiting participation in the electoral process.[12]

Plainly, Rule 58 erects "increased barriers" to candidacy as formidable as the filing date changes at issue in *Hadnott v. Amos,* supra, [394 U.S.] at 366, 22 L.Ed.2d 336, 89 S.Ct. 1101 [at 1105] (2 months), and *Allen v. State Board of Education,* supra, [393 U.S.] at 551, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 824] (20 days). To require preclearance of Rule 58 follows directly from our previous recognition that § 5 must be given 'the broadest possible scope,' *Allen v. State Board of Elections,* supra, at 567, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 832], encompassing the "subtle, as well as the obvious," forms of discrimination. 393 U.S., at 565, 22 L.Ed.2d 1, 89 S.Ct. 817 [at 831]. Informed by similarly expansive legislative and administrative understandings of the perimeters of § 5, we hold that obstacles to candidate qualification such as the Rule involved here are "standard[s], practice[s], or procedure[s] with respect to voting."

---

[10] As this Court has recognized in its decisions, invalidating certain filing-fee schemes under the Fourteenth Amendment, "we would ignore reality" were we not to acknowledge that a financial barrier to candidacy "falls with unequal weight on voters, as well as candidates," since it "tends to deny some voters the opportunity to vote for a candidate of their choosing." *Bullock v. Carter,* 405 U.S. 134, 144, 31 L.Ed.2d 92, [92] S.Ct. 849 (1972) (filing fees of $1,424.60 or County Commissioner, $1,000 for Commissioner of General Land Office, and $6,300 for County Judge). See also *Lubin v. Panish,* 415 U.S. 709, 39 L.Ed.2d 702, 94 S.Ct. 1315 (1974) (filing fee of $701.60 for County Supervisor).

[11] For a review of voting rights litigation in the city of Albany, the county seat of Dougherty County containing 80% of its population, see *Paige v. Gray,* 399 F.Supp. 459, 461–463 (MD Ga.1975), vacated in part, 538 F.2d 1108 (CA5 1976), on remand, 437 F.Supp. 137, 149–158 (MD Ga.1977).

[12] The dissent suggests, post [439 U.S.] at 53, [99 S.Ct. at 379] 58 L.Ed.2d, at 287, that Rule 58 is directed only toward barring "the expenditure of public funds to support the candidacy of an employee whose time and energies may be devoted to campaigning, rather than counseling school children." Insofar as the Board is concerned about its employees' failure to discharge their contractual obligations while standing for office, it has a variety of means to vindicate its interest. The Board may, for example, prescribe regulations governing absenteeism, or may terminate or suspend the contracts of employees who willfully neglect their professional responsibilities. See Ga.Code § 32–2101c

(1975); *Ransum v. Chattooga County Board of Education,* 144 Ga.App. 783, 242 S.E.2d 374 (1978). What it may not do is adopt a rule that explicitly and directly burdens the electoral process without preclearance.

### Question to be Decided

42 U.S.C. § 1973c, commonly called Section 5 of the Voting Rights Act, encompasses "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 ...." The First part—"any voting qualification or prerequisite to voting ... different from that in force or effect on November 1, 1964 ..." plainly applies just to the voting process. Since petitioner complains of after the voting policies—applicable to those who have been elected by votes already cast—we are not concerned with the first part of the statute. We are, however, concerned with the second part—"any ... standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 ..." and must resolve whether or not the complained of conduct of the defendant board constitutes "any ... standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964 ..." In so deciding we first must determine whether or not there is "any ... standard, practice, or procedure ... different from that in force or effect on November 1, 1964...."

The parties stipulated that on November 1, 1964, the defendant board had no standard, practice, or procedure pertaining to employees elected to public office taking leave without pay to attend to the duties of elected office. Since any such standard, practice, or procedure adopted after November 1, 1964, would thus be different, it is only necessary to determine whether or not the defendant board adopted any such standard, practice, or procedure.

In determining whether or not any such standard, practice, or procedure was adopted, Rule 58, because it was found to be in violation of the Voting Rights Act and as a matter of law never in effect, *see Terrazas v. Clements,* 537 F.Supp. 514, 520 (D.C.Tex.1982), cannot be taken into consid-

eration. The earlier litigation between these parties "wiped [Rule 58] from the books" as if it never existed. (Tr. p. 104).

Assuming that this court finds that any such standard, practice, or procedure was adopted, the second question to be answered is whether or not it is "with respect to voting...."

### Contentions of the Parties

Plaintiff first argues that the defendant school board had no policy concerning leave without pay for employees holding elective office to attend to the duties of office and that the adoption of a policy prohibiting such leave is a "standard, practice, or procedure with respect to voting"—a change from no policy to some policy—a change encompassed by Section 5 and therefore ineffective until Section 5, clearance is obtained. For that argument plaintiff relies upon *NAACP v. State of Georgia*, 494 F.Supp. 668 (N.D.Ga.1980) (Tr. p. 99).

Plaintiff's second argument is that defendant board of education has adopted a policy of considering requests of employees for leave without pay to attend to the duties of elective office, on a case-by-case basis; that policy is a change encompassed by Section 5 and therefore ineffective until precleared. (Tr. p. 100).

Plaintiff also relies upon the Justice Department's suggestion by letters that a covered change has occurred. Supporting that argument is § 51.5(c)(4) of the Attorney General's regulations which require Section 5 preclearance of "[a]ny alteration affecting the eligibility of persons to become or remain candidates or obtain a position on the ballot in primary or general elections or *to* become or *remain officeholders.*" 28 CFR § 51.4(c)(4) (emphasis added); 439 U.S. at 39, 99 S.Ct. at 373, 58 L.Ed.2d at 278. The ability of plaintiff White to remain an officeholder, they thus suggest, has been impaired by the school board's policy of not granting such leave.

In response defendant school board argues that plaintiff in effect is suggesting that under the Voting Rights Act the Attorney General or the United States District Court for the District of Columbia must pass judgment upon every board of education decision to grant or withhold leave without pay to an elected official to attend to the duties of his office. If this be true, the defendant board suggests the Voting Rights Act has removed the board's authority to do anything without going to Washington for approval. *See,* Justice Powell's dissent, 439 U.S. at 54, 99 S.Ct. at 380, 58 L.Ed.2d at 287. The school board further urges that the plaintiff's argument that every such decision must be precleared was answered by footnotes 3 and 12 of the majority opinion of the Supreme Court of the United States, to wit:

3. The Solicitor General and counsel for appellants advise us that appellee was also on unpaid leave during his participation in the annual two and one-half month sittings of the Georgia General Assembly in 1975, 1976, 1977, and 1978. Brief for United States as Amicus Curiae 4 n. 1; Tr. of Oral Arg. 6. Appellee did not challenge this application of Rule 58 below. We therefore do not consider whether preclearance is required for a policy governing mandatory leaves during the interval in which an employee is actually absent due to legislative responsibilities.

439 U.S. at 35, 99 S.Ct. at 370, 58 L.Ed.2d at 275.

12. The dissent suggests, post [435 U.S.] at 53, [99 S.Ct. at 379] 58 L.Ed.2d at 287, that Rule 58 is directed only toward barring "the expenditure of public funds to support the candidacy of an employee whose time and energies may be devoted to campaigning, rather than counseling school children." Insofar as the Board is concerned about its *employees' failure to discharge their contractual obligations* while standing for office, it has a variety of means to vindicate its interest. *The Board may, for example, prescribe regulations governing absenteeism,* or may terminate or suspend the contracts of employees who willfully neglect their professional responsibilities. See Ga.Code § 32–2101c (1975); *Ransum v. Chattooga County Board of Education,* 144 Ga.App. 783, 242 S.E.2d 374 (1978). *What it may not*

*do is adopt a rule that explicitly and directly burdens the electoral process without preclearance.* (emphasis added).

439 U.S. at 42, 99 S.Ct. at 374, 58 L.Ed.2d at 280. The defendant school board in effect says it has done exactly what the Supreme Court said it could do without going to Washington for approval or disapproval—"prescribe regulations governing absenteeism" on account of its concern about its employee's failure to discharge his contractual obligations.

### Did the School Board Enact or Seek to Administer a Different Standard, Practice, or Procedure?

In May, 1972, plaintiff John E. White, a Negro, and employee of defendant board of education, announced his intention to run for the office of state representative. He qualified to run in June, but was defeated in the August primary. In 1974, he qualified, ran, and was elected in both the August primary and November general elec-

tions. In June, 1976, he qualified again and without opposition was elected in November. Because of Rule 58 he took leaves of absence without pay from time to time during his candidacies, but that ceased on March 27, 1977, when this court enjoined use of Rule 58; shortly thereafter—April 11, 1977—the defendant school board rescinded Rule 58.

Plaintiff White was employed by the defendant school board under a twelve-month contract. In common with all other school board employees he was permitted to be absent with pay · for vacation, personal leave, and sick leave. Desiring to also be absent from work but without pay for such additional time as was required to attend the January until March, 1978, legislative session and necessary committee meetings, Mr. White requested and was granted leave without pay for the 1978 legislative session. That decision pertained only to Mr. White and his absence for that particular session; it thus did not constitute a "standard,[4] practice,[5] or procedure [6]" per-

---

**4.** Standard means:

Stability, general recognition, and conformity to establish practice. *Standard Accident Ins. Co. v. Standard Surety & Casualty Co.,* D.C.N.Y., 53 F.2d 119, 120. A type, model, or combination of elements accepted as correct or perfect. A measure or rule applicable in legal cases such as the "standard of care in tort actions. Double standard; Reasonable man doctrine or standard; Standard of care. An ensign or flag used in war."
Black's Law Dictionary, 5th Ed.

**5.** Practice means:

Repeated or customary action; habitual performance; a succession of acts of similar kind; custom; usage. Application of science to the wants of men. The exercise of any profession....
Black's Law Dictionary, 5th Ed.

**6.** Procedure means:

The mode of proceeding by which a legal right is enforced, as distinguished from the substantive law which gives or defines the right, and which, by means of the proceeding, the court is to administer; the machinery, as distinguished from its product. That which regulates the formal steps in an action or other judicial proceeding; a form, manner and order of conducting suits or prosecutions. The judicial process for enforcing rights and duties recognized by substantive law and for justly administering redress for infraction of

them. *Sims v. United Pacific Ins. Co.,* D.D. Idaho, 51 F.Supp. 433, 435.

Procedure is machinery for carrying on suit including pleading, process, evidence and practice, whether in trial court or appellate court. *Brooks v. Texas Emp. Ins. Ass'n,* Tex. Civ.App., 358 S.W.2d 412, 414.

The laws of procedure is what is commonly termed by jurists 'adjective law' (q.v.).
Black's Law Dictionary, 5th Ed.

1a: a particular way of doing or of going about the accomplishment of something (the book is lucid in its _ —H.B. Wehle) (democractic_) (told me he didn't especially like my _) b(1): a particular course of action (a _ that respects the dignity and worth of the individual—W.O. Douglas) (2): a particular step adopted for doing or accomplishing something (one of his first _s was to investigate the reports) (3): a series of steps followed in a regular orderly definite way: method (surgical _) (therapeutic _) (scientific _) c(1): a traditional, customery, or otherwise established or accepted way of doing things (told him it was not the _ of citizens of that country to act in that way (2): protocol 4 (sticklers for _ —Time) d: an established way of conducting business (as a deliberative body: as (1): the accepted urage of parliamentary bodies: established parliamentary practice: parliamentary order (rules of _) (2): the established manner of conducting judicial business and litigation including pleading, evidence, and practice. 2a obs: the progress of contin-

taining to employee absence. It was nothing more than an individual personnel decision.

After Mr. White was re-elected in November, 1978, he and school board employees Parkman and Cutler, who ran for the first time in 1978 and were elected as state representative and county commissioner, made a joint request for leave without pay to attend to their respective elected duties. Told first of the board's policy that all twelve-month employees will be expected to work the entire twelve months except for vacation time, their request was approved with the understanding that a two-year study of the effect of their absences for political purposes on their job performance would be made and the matter would be reconsidered at that time. A "standard, practice, or procedure" being at the least a precedent on which the affected employees and others may rely, the defendant board put those employees on notice that this decision created no precedent by advising that a two-year effect on job performance study would be conducted and the matter reconsidered at the end of the study. No "standard, practice, or procedure" was thus established. It was nothing more than three individual personnel decisions. Following the board's decision regarding Mr. White, Mr. Cutler, and Mrs. Parkman, the school superintendent formulated regulations to implement the experimental leave which had been granted. (Pl.Ex. 1). These regulations relate only to the specific leave which had been granted; they do not evidence adoption of a political leave policy or practice.

On April 15, 1980, the defendant board met and in the light of the promised two-year study of the effect of the absences of its elected employees on their job performance, decided not to allow its employees to be absent without pay to attend to their elective offices. While the defendant board labeled this decision as one establishing a policy on political leave, the board in reality decided not to allow its employees who are elected to public office greater time away from the job than they and all other employees are otherwise allowed. That usual time can be used at the option of the employee, not only for vacation and personal leave but also to attend to the duties of elective office. Otherwise employees are expected to perform their contracts.

If the board had thereafter arbitrarily refused to consider requests for political leaves of absence on an individual basis, the plaintiff's argument that the April, 1980, board action constituted an adoption of a "standard, practice, or procedure" different from that previously administered might be persuasive; but the board continued to consider each of Mr. White's requests. For instance, following his re-election in November, 1980, to another two-year term Mr. White requested unpaid leave from January-March, 1981 (Pl.Ex. 4). At its December 15, 1980, meeting

> The Board considered John White's request for political leave, and after a discussion of the effect of his absences from his position at the Albany Area Vocational Technical School, voted to deny his request. The vote, with Mr. Warren, the chairman, voting against allowing the leave, was five to one for denial of the request …." (Pl.Ex. 6).

The board informed Mr. White of its decision and expectation that he fulfill his contract for the school year. (Pl.Ex. 5).

Further, in January, 1983, Mr. White specifically requested the board to adopt a policy allowing legislative leave (Def.Ex. 6); when his request was denied (Def.Ex. 7) he then sought a leave of absence for himself to serve during the remaining weeks of the 1983 legislative session (Def.Ex. 8). The board expressed its willingness to meet with him in that regard (Def.Ex. 9).

Thus, the board's April, 1980, action constituted nothing more than its refusal to adopt a legislative leave policy and served in effect as a reaffirmation of its policy requiring employees to fulfill their contracts with the exception of time away from the job allowed to all.

uation of some action or process b archair:     the fact of issuing from a source.

With due respect to *NAACP v. State of Georgia*, 494 F.Supp. 668, relied upon by plaintiff, the judges of this court fail to perceive how a negative decision can create a "standard, practice, or procedure" for anything. If it did, every decision of every covered political entity would be encompassed by Section 5; covered entities could not say "yes" or "no" without asking the United States District Court for the District of Columbia or the Attorney General.

Plaintiff's argument that the decision to consider such requests one at a time is a change, is no more convincing. As a matter of common sense, decisions on individual personnel matters have always been made on an individual basis, both before and after the Voting Rights Act. That is hardly a change.

Before and after this litigation the defendant board of education had neutral personnel policies and practices governing all forms of absenteeism. The defendant board has simply refused to alter those neutral policies and practices. Plaintiff does not suggest, and the evidence in no way shows, that the refusal of the board has a potential for discrimination. This court likewise fails to perceive how the board's refusal to change its neutral personnel policy could possibly be a constraint on employee political activity or burden the electoral process.

Viewed from every angle and in the brightest light of the Supreme Court's broad interpretations [7] of the words "standard, practice, and procedure," this board's refusal to alter its neutral personnel policies to accommodate this employee elected office holder does not possibly constitute a Section 5 "standard, practice, or procedure."

### The Attorney General's Regulations

As already mentioned, the Attorney General's regulations require Section 5 preclearance of *"[a]ny alterations affecting the eligibility of persons* to become or remain candidates or obtain a position on the ballot in primary or general elections or *to become or remain officeholders."* 28 CFR § 51.4(c)(4) (emphasis added).

At the time plaintiff White first announced his candidacy in 1972 he was employed by defendant board of education under a twelve-month contract and, like all other employees, was entitled to be absent with pay for certain specified purposes such as vacation and sickness. When plaintiff White announced, he was the first employee of the defendant board to run for public office. The defendant board had never been presented with the question of whether or not to allow leave, without pay, to an employee to attend to the duties of elective office. Before announcing his candidacy he did not ask the defendant board to consider the question. His request for additional leave without pay came only after he was elected. Since such leave was not allowed to any employee before Mr. White was elected, the failure of the defendant board after his election to allow such leave in no way altered or changed the ability of Mr. White to remain an officeholder. Given the particular deference it deserves, *see* 439 U.S. at 39, 99 S.Ct. at 372, 58 L.Ed.2d at 278, the Attorney General's regulation thus does not support the plaintiff's position that the refusal to adopt a leave without pay policy is a Section 5 "standard, practice, or procedure."

There having been no "standard, practice or procedure" enacted or sought to be administered, it is unnecessary to consider whether or not the conduct of the defendant board was "with respect to voting."

### CONCLUSION

The plaintiff John E. White has failed to prove that the defendant Dougherty County Board of Education has enacted or sought to "administer any ... standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964...." 42 U.S.C. § 1973e. The Voting Rights Act has therefore not been violated, and the plaintiff is not entitled to the injunction that he moved for.

---

7. *See, Allen v. Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) and *Dougherty County Board of Education v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269.

Let judgment be entered for the defendants.

R. LANIER ANDERSON, Circuit Judge, dissenting:

The issue before this court is whether the Dougherty County Board of Education changed a "standard, practice or procedure with respect to voting" when it ceased granting leave of absence to state legislator John White. This question of statutory interpretation does not require an opinion about the ultimate wisdom or validity of the change,[1] but only a determination of whether such a "change of practice" has occurred. In my judgment the majority opinion conflicts with Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, particularly as interpreted by the Supreme Court in *Dougherty County Bd. of Ed. v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978). Therefore, I respectfully dissent.

## I. FACTS

The following facts are undisputed. In 1964, when the Voting Rights Act became effective, the Board had no policy concerning employee leaves of absence to serve in political office. Such was the case until 1972, when employee White declared his candidacy for state legislature, the first black in the county within memory to do so. At that time, the Board adopted "Rule 58," which forced White to take unpaid leave during the campaign and any period of officeholding. Despite requests from the Justice Department, the Board refused to follow the pre-clearance requirement of Section 5 by seeking federal authorization for the rule.

In 1976, White filed suit against the Board, challenging the part of Rule 58 that required him to take leave during his campaign for office.[2] A three-judge district

court held that the rule could not be applied until pre-cleared in accord with the Voting Rights Act, *White v. Dougherty County Bd. of Ed.*, 431 F.Supp. 919 (M.D. Ga.1977). The Supreme Court affirmed. *Dougherty County Bd. of Ed. v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978). Rather than submit Rule 58 to the Attorney General or District Court for the District of Columbia for Section 5 pre-clearance, the Board rescinded the rule in 1977.

After the rescission, White was no longer forced to take unpaid leave during a campaign for office. He continued, however, to request leave so that he could serve during Georgia's 40-day legislative term. Other Board employees also sought leave to serve in political office. From 1977 to 1980, these requests for political leave were granted. The Superintendent's office promulgated a set of regulations about the administration of political leave. The Board informed White that it planned to study the effects of such leave on absenteeism and reassess the decision to grant leave at a later date.

Following the 1980 legislative term, the Board considered the Superintendent's study of absenteeism due to political leave. The minutes of the April 15, 1980 Board meeting report the following decision:

> The question of granting leave of absence for political purposes was brought before the Board. Following discussion concerning the question, Mr. Murphy moved that no leaves of absences be granted to personnel of the Dougherty County School System for political purposes. Mr. Hall seconded the motion and the same was approved by a vote of five to one.

White was notified of this decision on April 22 by a letter from Superintendent Robertson which stated that "[t]he Dougherty

---

1. To the extent that the majority has relied on the evidence of White's absenteeism and the wisdom or merit of the "no leave" decision as a personnel practice, I submit that it succumbs to an improper perspective of the issue before this court. If the propriety of the practice were a proper subject for our attention, I would probably agree with the majority. However, it is unmistakably clear that, in applying the pre-clearance requirement of Section 5, we are *not*

to ask "whether the provision is ... innocuous and likely to be approved." *Dougherty County Bd. of Ed. v. White*, 439 U.S. at 42, 99 S.Ct. at 374.

2. White did not challenge the part of the rule which required leave during terms of office-holding. *See Dougherty County Bd. of Ed. v. White*, 439 U.S. at 35 n. 3, 99 S.Ct. at 370 n. 3.

County Board of Education has decided that the Dougherty County School System will not grant any leaves of absence to its personnel for political purposes."

In November of 1980, White requested that the Board grant him leave to serve during the 1981 term. The Board minutes show that on December 15, after discussing the effects of White's absenteeism, the Board denied White's request. Subsequent requests by White and others have all been denied by the Board. The Justice Department has notified the Board that its new policy on political leave should be submitted for pre-clearance, but the Board has refused to submit it.

## II. DISCUSSION

White contends that in deciding not to grant any leaves of absence for political purposes, the Board changed its practice of permitting such leave and was thus required to obtain federal preclearance. The Board contends that there has been no such change; it argues that the pre-1980 decisions to grant leave were merely case-by-case evaluations and that, despite the unequivocal language in the April 1980 Board minutes, it has continued to review requests on a case-by-case basis. This discussion will explain that (a) the April 1980 Board action constituted the adoption of a "no leave" policy; and (b) even if the requests for political leave are still given case-by-case consideration, the actions of the Board under the circumstances here nevertheless constitute a "change in practice" as defined by the Voting Rights Act.

**3.** The majority's opinion on this factual matter is somewhat ambiguous. At one point it states:
> [I]t is thus the policy and practice of the defendant board of education to deny its employees' requests for leaves of absence without out pay to attend to the duties of elective office....

Majority Opinion at 1485. The opinion later suggests, however, that the majority views the actions of the Board after April 1980 as a continuation of the case-by-case consideration.
> While the defendant board labeled this decision as one establishing a policy on political leave, the board in reality decided not to allow its employees who are elected to public office greater time away from the job than they and all other employees are otherwise allowed. That usual time can be used at the

### A. The Board Adopted a "No Leave" Policy

If the evidence shows that the Board adopted a *per se* "no political leave" policy on April 15, 1980, it could hardly be argued that such a policy would not constitute a change requiring pre-clearance. Because the majority concludes that there was no change, it apparently accepts the Board's contention that political leave is still considered on an individual basis.[3] I respectfully submit that the majority's conclusion has very weak support in the evidence.

Whatever the Board's motivation, it granted all requests for political leave from 1977 through 1980. The Board, considering the "two-year study" of absenteeism conducted by the Superintendent, voted on April 15, 1980, that *"no leaves of absences* be granted to personnel of the Dougherty County School System .. *for political purposes"* (emphasis added). Even though White had not at that time requested the Board's consideration of the political leave question, Superintendent Robertson took it upon himself to write White and declare that the Board "has decided that the Dougherty County School System will not grant *any leaves of absences* to its personnel *for political purposes"* (emphasis added). The language of the Board minutes and the Robertson letter could not be more clear in establishing an intent to deny political leave altogether.

The Board's contention that it continued to consider requests for political leave on a

option of the employee, not only for vacation and personal leave but also to attend to the duties of elective office. Otherwise employees are expected to perform their contracts. *Id.,* at 1492. It is worthy of note that even the latter articulation by the majority implicitly acknowledges that the Board would not entertain requests for absence when the only reason justifying the request was related to political office. In other words, the Board simply was no longer going to consider the desire to hold political office as a factor in granting leave. I submit that this is vastly different from the case-by-case individual consideration which the Board would give, for example, to a request by a history teacher to go to Egypt where she would have the opportunity to observe and study the pyramids.

case-by-case basis is unpersuasive for two reasons. First, the only evidence to support this view, aside from bald post facto assertions, is an indication in the December 1980 Board minutes that White's request for leave was denied "after a discussion of the effect of his absences from his position." If, as Superintendent Robertson testified, the Board's April "no leave" decision was based upon an assessment of absenteeism, then the December reference to White's absence does *not* demonstrate new consideration, but merely a re-hashing of the previously considered reasons. The Board's own characterization of the April decision casts doubt upon the sincerity of its later rationalization.

Second, in contrast to the sparse and ambiguous evidence supporting the Board's case-by-case assertion, there is strong and convincing evidence that the Board did change its prior practice of permitting political leave, adopting a "no leave" policy in April of 1980. The April 15, 1980, minutes so state in unequivocal terms: *"no leaves of absence . . . to personnel . . . for political purposes."* Following that meeting, the Superintendent on April 22 wrote a letter to White again articulating that the Board would not "grant *any leaves* of absence to its personnel for political purposes." The fact that the April 1980 decision was made as the result of the Superintendent's two-year study of the matter of political leaves of absence indicates that the policy was a new policy, and not merely a continuation of a prior case-by-case policy. Finally, it is significant that political leave was in fact granted to White and others for the legisla-

tive sessions in early 1978, 1979 and 1980; but that, after the April 1980 decision, all requests for political leave were denied.

I respectfully submit that it requires a strained interpretation of the evidence to accept the Board's assertions that it has maintained a case-by-case policy.[4] In my judgment, the sparse and ambiguous evidence discussed above cannot be interpreted to overcome the plain meaning of the April "no leave" decision and other Board actions. I respectfully suggest that the evidence is almost overwhelming that, after April of 1980, the Board would not consider the holding of elective office as a factor in the decision to grant leave. Thus, I dissent.

B. *Assuming Arguendo a Case-by-Case Approach, the Board's Actions Constitute a Change of Practice.*

The majority finds that the Board has continued to consider requests for political leave on a case-by-case basis, and then concludes that there has been no change in a "standard, practice or procedure with respect to voting." Assuming arguendo the majority's case-by-case finding, I respectfully submit that the changed pattern of decision-making here is sufficient to establish a legal "change of practice" under the Supreme Court's broad reading of the Voting Rights Act.

The legislative history of the pre-clearance requirement demonstrates that it was meant to be interpreted expansively. *Dougherty County Bd. of Ed. v. White,* 439 U.S. at 38, 99 S.Ct. at 372. When it

---

**4.** The Board claims that the April 15 ruling merely affirmed an earlier decision that all employees would fulfill the terms of their employment contracts. However, the Board adopted its "fulfill the contract" policy in 1978. That policy did not prevent the Board from thereafter granting political leave for the legislative sessions in 1979 and 1980. Thus, it cannot be argued that the April 1980, ruling merely affirmed an earlier "fulfill the contract" policy.

The majority suggests a different interpretation, calling the April 1980 action a "refusal to adopt a legislative leave policy." Majority Opinion at 24. I can find no evidence that White or anyone else had requested the Board in April of 1980 to adopt a legislative leave policy. The

only evidence suggesting that the Board refused to adopt a political leave policy related to later events. In 1983, after the Board had acted in April 1980 and after the Board had denied all subsequent requests for political leave, White wrote the Board requesting that it change its no leave policy. This request was rejected. This later action is not relevant to our determination of the scope and meaning of the Board's earlier action in April of 1980. I submit that the characterization of the Board's April 1980 action as a refusal to change a neutral policy is crucial to the majority's reasoning and I respectfully suggest that there is no evidence to support that characterization.

was before Congress, Attorney General Katzenbach testified that the phrase "practice" (with respect to voting) should be "all-inclusive." Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., Pt. 1, pp. 191–92 (1965). This breadth of interpretation is necessary to prevent subtle techniques of discrimination that affect the electoral process. *Allen v. Board of Elections*, 393 U.S. 544, 565, 89 S.Ct. 817, 831, 22 L.Ed.2d 1 (1969).

As a corollary to the expansive interpretation given the Act, courts have accorded "particular deference" to government officials charged with enforcing its provisions. *Dougherty County Bd. of Ed. v. White*, 439 U.S. at 39–40, 99 S.Ct. at 372–373; *United States v. Board of Commissioners of Sheffield*, 435 U.S. 110, 131–32, 98 S.Ct. 965, 979, 55 L.Ed.2d 148 (1978). *See also* 28 C.F.R. § 51.3 (1983) (designating officials within the Justice Department with authority to administer the Act).

A final focus guiding interpretation of the Act is its over-arching concern for preventing voting changes that may present a "potential for discrimination." *Dougherty County Bd. of Ed. v. White*, 439 U.S. at 42, 99 S.Ct. at 374. While the statutory language of Section 5 requires pre-clearance for *any* changed "standard, practice or procedure with respect to voting," the concern with discrimination should illuminate that inquiry, implicating even innocuous changes that involve such a potential. *Id.*

Considering these well established statutory guidelines—the expansive interpretation of the Act, deference to enforcement officials, and concern for potential discrimination—the uncontroverted facts here persuade me that the Board has adopted a new "practice" vis-a-vis political leave even if it still operates case-by-case. Prior to 1980, the Board always granted political leave.[5]

In April 1980, it considered a two-year study of absenteeism and decided to grant no more leave. Since that decision, there has been no grant of political leave. The new focus of decision-making resulting from the study and from the April 1980 decision, coupled with the complete turnaround from the Board's past actions, warrant the conclusion that there is a changed "practice."

Application of the above-mentioned Supreme Court guidelines compels this result. First, it would run against the expansive interpretation of the statute to overlook the Board's drastically different pattern of decision-making simply because the Board claims to be operating "case-by-case." Support for this proposition is gleaned from 28 C.F.R. § 51.13 (1983). If a covered entity implements a "recurrent practice" (*e.g.*, case-by-case consideration of whether to grant political leave), then a statutory change occurs when "the rules for determining when such a practice or procedure will be implemented are changed." *Id.* The Board claims that it began to deny political leave because a "two-year study" showed that absenteeism was harmful. To the extent that this study injected a new and significant factor into the "case-by-case" deliberation, a "change of practice" has occurred.

The second guideline, deference to officials charged with enforcing the Act, also supports the conclusion that the Board did indeed change its practice. The Department of Justice made three requests that the Board submit its new practice on granting political leave and the Board refused. The June 30, 1981, letter forcefully stated the Department's position that the "changes in the board's treatment of political leave requests are subject to the pre-clearance requirements of Section 5."[6]

Finally, the "potential for discrimination" factor supports the conclusion that the

---

5. This uniform treatment of requests for political leave during the years 1977–80 meets the majority's own definition of "practice," drawn not from applicable legislative history but instead from *Black's Law Dictionary*, 5th ed. ("Repeated or customary action; habitual performance; a succession of acts of similar kinds. ...").

6. The majority quotes the first letter from the Department of Justice and highlights its discussion of an *apparent* change in voting procedures. Majority Opinion at 1484. The majority fails to discuss, however, the second and third letters from the Department in which, following further investigation, the officials clearly state their position that an actual change has occurred.

Board's new pattern of decisions is a "change in practice." In the first *White* case, the Supreme Court noted that John White was the first black candidate for the state legislature in a county with a long history of racial discrimination in voting practices. *Dougherty County Bd. of Ed. v. White*, 439 U.S. at 42, 99 S.Ct. at 374. The concern that discrimination might have affected the school board regulation burdening his candidacy was a special consideration suggesting the need for pre-clearance. *Id.* The Supreme Court's analysis of the potential for discrimination in that case is equally applicable here. This case involves the same county history of discrimination, the same school board, and the same school employee. If the "potential for discrimination" was of concern in the previous case, it must of necessity be a greater concern here. The instant case adds the fact that the Board has rescinded Rule 58, which *White* found to be a potentially discriminatory rule affecting candidacy, and has adopted another practice, which was expressed in terms flatly prohibiting political leaves of absence, and which, even if interpreted to have some flexibility, has resulted in practice in the denial of every request for political leave.

For the foregoing reasons, I respectfully submit that the analysis prescribed in *White* compels a conclusion that the Board's actions under the circumstances here constitute a change of practice.[7] Thus, I dissent.

---

**7.** The Board attempts to bring itself under the protection of footnote 12 of the *White* opinion, which suggests that a *neutral* personnel policy governing absenteeism generally would not require pre-clearance. The discussion in this opinion demonstrates that the evidence here cannot be interpreted as involving a *neutral* rule. Rather, the evidence is clear that the Board's action, including in particular the two-year study and the April 1980 decision, has focused "explicitly and directly" on political leaves of absence, precisely the circumstance that the *White* footnote held would require pre-clearance.

**8.** Because the majority found no change in "practice," it did not go on to consider whether the change was one "with respect to voting." Majority Opinion at 1498. *Dougherty County Bd. of Ed. v. White*, 439 U.S. 32, 99 S.Ct. 368, 58

## III. CONCLUSION

For the reasons discussed, I would find as a factual matter that the Board adopted a "no leave" policy or practice on April 15, 1980, which obviously constitutes a "change of practice." Alternatively, even assuming *arguendo* the majority's case-by-case finding, I would conclude as a matter of law that the Board's actions under the uncontroverted circumstances here constitute a "change of practice" when judged by the standards set out by the Supreme Court in *White*.[8]

I respectfully dissent.

L.Ed.2d 269 compels the conclusion that the changed practice is "with respect to voting," because, by hampering White's ability to serve, it erects "increased barriers" to his candidacy and officeholding. *Id.* at 43, 99 S.Ct. at 374. The barrier here, *i.e.*, precluding leave altogether, is as significant as that in the previous case, *i.e.*, presenting a financial disincentive to candidacy by requiring leave during the campaign. Furthermore, applicable regulations recognize that changes that affect an officeholder's ability to serve are appropriately within the scope of the Act. *See* 28 C.F.R. § 51.12(g) (1983) ("Changes affecting voting include, *but are not limited to,* the following examples: ... (g) any change affecting the eligibility of persons to become or remain candidates, to obtain a position on the ballot in primary or general elections, *or to become or remain holders of elective offices.*") (emphases added).