**Stanley C. BURGER, and Earl Aquila Garrettson, Jr., Plaintiffs,**

v.

**Thomas L. JUDGE, as Governor of the State of Montana, et al., Defendants.**

**Civ. No. 2284.**

United States District Court, D. Montana, Helena Division.

July 11, 1973.

Judgment Affirmed Dec. 3, 1973. See 94 S.Ct. 563.

Morrow, Nash & Sedivy, Bozeman, Mont., for plaintiffs.

Robert L. Woodahl, Atty. Gen., Lawrence D. Huss and John P. Connor, Jr., Deputy Attys. Gen., Jerome T. Loendorf, Special Asst. Atty. Gen., Helena, Mont. and Marshall Murray, Special Asst. Atty. Gen., Kalispell, Mont., for defendants.

OPINION

Before BROWNING, Circuit Judge, and MURRAY and JAMESON, District Judges.

PER CURIAM:

Plaintiffs seek a declaratory judgment "that the proposed Constitution

for the State of Montana was declared adopted in violation of the Fourteenth Amendment to the Constitution of the United States, Article IV, Section 4 of the Constitution of the United States, and the Voting Rights Act of 1965 (42 U.S.C. Section 1973) and is, therefore, void." The case was submitted to a three-judge court on an agreed statement of facts, answers to interrogatories, depositions and exhibits.

At a special election on June 6, 1972 the electors of Montana voted on four propositions submitted by a Constitutional Convention held pursuant to (1) the authority of Section 8 of Article XIX of the Montana Constitution; [1] (2) the vote of the electors of Montana at the general election on November 3, 1970; and (3) the Enabling Act of the Legislative Assembly of the State of Montana, Chapter 296, Session Laws of 1971, as amended by Chapter 1, Laws of First Extraordinary Session, 1971.[2]

The constitutional election ballot reads:

INSTRUCTIONS TO VOTERS: PLACE AN "X" IN THE BOXES WHICH EXPRESS YOUR PREFERENCES. THE FULL TEXT OF THE PROPOSED CONSTITUTION AND THE SEPARATE PROPOSITIONS IS AVAILABLE FOR INSPECTION AT YOUR POLLING PLACE. IF THE PROPOSED CONSTITUTION FAILS TO RECEIVE A MAJORITY OF THE VOTES CAST, ALTERNATE ISSUES ALSO FAIL.

## OFFICIAL BALLOT
### PROPOSED CONSTITUTION
**PLEASE VOTE ON ALL FOUR ISSUES**

**1.**
(Vote for One)

☐ **FOR** the proposed Constitution.

☐ **AGAINST** the proposed Constitution.

> The proposed Constitution will include a bicameral (2 houses) legislature unless a majority of those voting in this election vote for a unicameral (1 house) legislature in issue 2.

**2.**
(Vote for One)

☐ **2A.** **FOR** a unicameral (1 house) legislature.

☐ **2B.** **FOR** a bicameral (2 houses) legislature.

**3.**
(Vote for One)

☐ **3A.** **FOR** allowing the people or the legislature to authorize gambling.

☐ **3B.** **AGAINST** allowing the people or the legislature to authorize gambling.

**4.**
(Vote for One)

☐ **4A.** **FOR** the death penalty.

☐ **4B.** **AGAINST** the death penalty.

1. Section 8 of Article XIX provides in pertinent part:
 "The legislative assembly may at any time, by a vote of two-thirds of the members elected to each house, submit to the electors of the state the question whether there shall be a convention to revise, alter, or amend this constitution; and if a majority of those voting on the question shall declare in favor of such convention, the legislative assembly shall at its next session provide for the calling thereof. * * * Said convention shall meet within three months after such election and prepare such revisions, alterations or amendments to the constitution as may be deemed necessary, which shall be submitted to the electors for their ratification or rejection at an election appointed by the convention for that purpose, not less than two nor more than six months after the adjournment thereof; *and unless so submitted and approved by a majority of the electors voting at the election, no such revision, alteration or amendment shall take effect.*" (Emphasis added)

2. Section 17(9) of Chapter 296 provides in pertinent part:
 "If a majority of the electors voting at the special election shall vote for the proposals of the convention the governor shall by his proclamation declare the proposals to have been adopted by the people of Montana."

237,600 electors voted at the special election on June 6, 1972. Of this number 116,415 voted for the proposed constitution (Proposition 1) and 113,883 voted against it. A total of 7,302 persons voted neither for nor against the proposed constitution, but voted on one or more of the other propositions.[3] Thereupon the Governor of Montana proclaimed that the proposed constitution had been approved and adopted.

Original proceedings were instituted in the Supreme Court of Montana by William F. Cashmore and Stanley C. Burger (one of the plaintiffs in this action), relators, against the Governor of Montana "seeking a declaratory judgment that the proposed 1972 Montana Constitution was not ratified and adopted because it was not 'approved by a majority of the electors voting at the election' as required by Article XIX, Section 8 of the present Montana Constitution." State ex rel. Cashmore v. Anderson, Mont., 500 P.2d 921, 924. The Supreme Court of Montana in its opinion on August 18, 1972, held, *inter alia*:

"Accordingly, we hold that 'approval by a majority of the electors voting at the election' as used in Article XIX, Section 8, of the Montana Con-stitution means approval by a majority of the total number of electors casting valid ballots on the question of approval or rejection of the proposed 1972 Montana Constitution. We hold that it does not refer to or include those electors who failed to express an opinion by a vote on that issue. The Secretary of State's certificate shows 116,415 votes in favor of the proposed constitution and 113,883 votes against the proposed constitution and no one contends these figures are incorrect. As these figures carry a presumption of correctness by statute, section 93–1301–7(15), R.C.M.1947, and as there is nothing to indicate otherwise, we hold that the proposed 1972 Montana Constitution was approved by the required majority and the Governor's proclamation thereof was correct." *Id.* at 929.[4]

A Petition for a Writ of Certiorari to the Supreme Court of the United States filed by Burger was denied without comment by an order entered February 20, 1973. This action followed.

Defendants contend, *inter alia*,[5] that this action does not present a justiciable controversy and that in any event it is not a proper case for a three-judge court under 28 U.S.C. § 2281.[6]

---

3. The election returns were canvassed by the state canvassing board and the results certified by, the Secretary of State as follows:

"FOR the proposed Constitution. 116,415
AGAINST the proposed Consti-
tution. 113,883
2A. FOR a unicameral (1 house)
legislature. 95,259
2B. FOR a bicameral (2 houses)
legislature. 122,425
3A. FOR allowing the people or
the legislature to author-
ize gambling. 139,382
3B. AGAINST allowing the peo-
ple or the legislature to
authorize gambling. 88,743
4A. FOR the death penalty. 147,023
4B. AGAINST the death pen-
alty. 77,733
Total number of electors voting. 237,600"

Defendants question the accuracy of the 7,302 figure, contending that the 237,600 total includes void ballots. It is stipulated, however, that unofficial recanvasses conducted by plaintiffs in 19 counties show that in those counties 3,476 more electors cast ballots than voted on Proposition 1. The addition of this figure to the 113,883 electors voting against Proposition 1 equals 117,359, which is in excess of the 116,415 voting in favor of Proposition 1.

4. Two of the five justices dissented, and "would hold that the * * * language 'a majority of the electors voting at the election', means just what it says", 500 P.2d at 930, and that "the natural significance" of this language "is that to determine whether the proposed constitution was adopted, you count the total number of electors voting at the election, and one half plus one must have voted for the measure or it fails." *Id.* at 933.

5. Since we are dismissing the action on the merits, it is unnecessary to consider other questions raised by the defendants.

6. 28 U.S.C. § 2281 provides that an injunction restraining the enforcement of a State statute "shall not be granted by any district

Most nearly in point is Kohler v. Tugwell, 292 F.Supp. 978 (E.D.La.1968), aff'd, 393 U.S. 531, 89 S.Ct. 879, 21 L.Ed.2d 755 (1969), where plaintiff sought an injunction prohibiting any action under a state constitutional amendment on the ground that the designation of the amendment as it appeared on the ballot misled voters. Relying upon the holding in Reynolds v. Sims [7] that "the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections", the court concluded that the question of whether the ballot was so misleading as to deprive the electors of their constitutional right to vote was a justiciable controversy. The three judges agreed that the Due Process Clause [8] was applicable, and two of the three judges were of the opinion that the issue was also justiciable under the Guaranty Clause.[9] The question of whether the controversy was properly before a three-judge court was not raised, and the court held that the electors had not been misled or deprived of any constitutional right by the manner in which the amendment was submitted.

In Watermeier v. Louisiana Stadium, 308 F.Supp. 273 (E.D.La.1969), aff'd, 398 U.S. 955, 90 S.Ct. 2172, 26 L.Ed.2d 539 (1970), it was expressly held that an action involving "an attack upon the constitutionality of the application, execution and operation of a state constitu-

tional amendment" was properly before a three-judge court.

 We conclude that this case is properly before a three-judge court.[10] In the event we should be mistaken, Judge Jameson, to whom the case was assigned and who requested the designation of the three-judge court, has individually arrived at the same conclusion with respect to the merits of the controversy.[11]

██ We turn now to the merits of the controversy. The parties have stipulated that the "terms 'approval of the majority of the electors voting at the election', 'electors' and 'electors voting at the election' have been defined by the Montana Supreme Court in State ex rel. Cashmore v. Anderson, supra," and are "res judicata for the purposes of this cause of action". Plaintiffs rely upon the Montana court's interpretation "to prove that the representations made by Montana officials prior to the election, and on the Ballot, as to what effect an elector's voting decision would have, were actually wrong." They argue that 7,302 electors were "misled by the change of rules, after the election was over," were "disenfranchised by the misleading and erroneous information," and "that the Federal Constitution and law will protect them from such action."

In support of their contention that the 7,302 electors were misled, plaintiffs rely upon (1) the official ballot, quoted

court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 * * *."

7. 377 U.S. 533, 554, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506 (1964).

8. U.S.Const. Amend. XIV, § 1.

9. Section 4 of Article IV of the United States Constitution provides that, "The United States shall guarantee to every State in this Union a Republican Form of Government * * *."

10. Moreover, we are satisfied that a substantial claim of unconstitutionality is raised by plaintiffs' complaint. As the Supreme Court

said in Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152, "The existence of a substantial question of constitutionality must be determined by the allegations of the bill of complaint." The claims "are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions which merely render claims of doubtful or questionable merit do not render them insubstantial for the purpose of 28 U.S.C. § 2281." Goosby v. Osser, 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

11. See Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117, 129 (S.D.N.Y.1969).

*supra*; (2) an official publication mailed to all voters; (3) a newspaper supplement, 197,500 copies of which were distributed by the 13 leading newspapers in the state; (4) an analysis prepared by the Montana Constitutional Convention Commission in 1971; (5) debate in the Constitutional Convention; and (6) Section 17(9) of Ch. 296, 1971 Session Laws, quoted *supra* in Note 2.

The plaintiff Burger voted against the proposed constitution. The plaintiff Garrettson was one of the 7,302 electors who did not vote on the constitution. (Proposition One). He testified in his deposition that he voted for a bicameral legislature, gambling, and the death penalty, and that he understood that if the proposed constitution failed "the alternate issues also fail." He failed to vote on the proposed constitution for two reasons: first, because he did not know enough "about the issues involved",[12] and second, because he felt that if he did not vote, "it was a vote against it." He had read the ballot and the newspaper supplement. Garrettson's wife voted as he did. There was no further testimony with respect to any other electors.

With respect to the official ballot, plaintiffs rely upon the recitals that, "If the proposed constitution fails to receive a majority of the votes cast, alternate issues also fail," and "The proposed constitution will include a bicameral (2 houses) legislature unless a majority of those voting in this election vote for a unicameral (one house) legislature in Issue 2." The reference to the "majority of those voting in this election" simply follows the language of the then existing constitution providing that no revision, alteration or amendment shall take effect unless approved by "a majority of the electors voting at the election".

It is obvious that if the proposed constitution failed to pass, the alternate issues would also fail. The ballot contains and underscores the statement "PLEASE VOTE ON ALL FOUR ISSUES."

The "OFFICIAL PUBLICATION OF THE 1972 CONVENTION", which was mailed to all voters, as required by Chapter 296, 1971 Session Laws of Montana, as amended, contains a sample ballot, the official text of the proposed constitution with explanation, and the following explanation of the ballot:

"THIS BALLOT HAS FOUR SECTIONS. IN THE FIRST SECTION THE VOTER WILL HAVE THE OPPORTUNITY TO VOTE 'FOR' OR 'AGAINST' THE PROPOSED 1972 CONSTITUTION.

"THEREAFTER FOLLOW THREE SEPARATELY SUBMITTED CONSTITUTIONAL PROPOSITIONS. THE VOTER MAY SELECT EITHER ALTERNATIVE ON PROPOSITION NO. 2. THE VOTER MAY VOTE FOR OR AGAINST EACH OF THE THIRD AND FOURTH PROPOSITIONS.

"THE THREE ALTERNATE ISSUES DO NOT AFFECT THE PRESENT CONSTITUTION. IF ADOPTED BY A MAJORITY OF THOSE VOTING AT THE ELECTION THEY WILL BECOME EFFECTIVE ONLY IF THE PROPOSED CONSTITUTION IS ADOPTED.

"THE VOTER SHOULD VOTE ON ALL FOUR QUESTIONS REGARDLESS OF WHETHER HE VOTES FOR OR AGAINST THE PROPOSED CONSTITUTION."

Both the ballot and the official publication mailed to all voters follow the lan-

---

12. Garrettson testified in part:
"A. In my own mind, I decided that not knowing enough about the issue involved, I would just not vote, or mark the ballot, whichever way you wish to call it.
\* \* \* \* \*
"A. I am taking a presumption that if people read the ballot as I read it, plus

the instructions, as I read it, that it takes a majority of the voters voting at the election to win any particular issue, then I would presume very strongly that they abstained from voting, as I did for any number of reasons. My reason was lack of knowledge of the two. And I felt that if I did not vote, it was a vote against it."

**510**

guage of the existing constitution and do not purport to construe or interpret its meaning. Both urge a vote on all four issues.

Plaintiffs next rely upon two statements in the newspaper supplement.[13] Under the heading "Frequently Asked Questions", the following appears:

"Why can't we vote on more separate issues? Why can't we vote on the proposal article by article?

"The convention had to strike a medium between a manageable and understandable ballot and a ballot so long it would be confusing. An article by article ballot would have contained at least 14 separate items and would have necessitated a most complicated adoption schedule. There is also a special consideration peculiar to the Montana situation. Article XIX, Section 8 of the 1889 Constitution requires that any item the convention submits to the people can be adopted only by a majority of the electors voting at the election. We know that as they go down the ballot voters fail to vote in increasing numbers on each subsequent item. Consequently, the likelihood of a proposition failing for the lack of a majority of those voting in the election increases with the addition of each item on the ballot."

The newspaper supplement contained a sample ballot, and on the same page an explanation of the ballot reading:

"Montana's citizens will vote on the Constitutional Convention's proposals on June 6. Because of wording in both the 1889 Constitution and the Convention Enabling Act, this will be a special election held at the same time as the primary elections. * * *

"It is essential that the voter understand several important points about this ballot. If you vote for the proposed Constitution, you will be voting for a constitution with a bicameral (2 houses) legislature. However, if a majority of those voting in the election vote for a unicameral house in item No. 2 on the ballot, the unicameral article will automatically be substituted for the bicameral article in the new Constitution.

"If the proposed Constitution fails, your vote on the other measures—the make-up of the legislature, gambling, and the death penalty—will not count because they automatically fail if the proposed Constitution is rejected. Second, your vote on these three questions will not count unless each is decided by a majority of those voting in the election. If you fail to vote on any item, you will aid in its defeat.

"If the proposed Constitution carries and the issue of gambling is not decided because neither those for nor those opposed get a majority of those voting in the election, then the same restrictions against gambling in Section 9, Article III of the proposed Constitution will be retained. Similarly, if the issue of capital punishment is not decided because neither those for nor those against get a majority of those voting in the election, then the situation will be as it is now: the new Constitution would leave the future of the death penalty in the hands of the legislature where it presently lies."

Richard B. Roeder, the author of the supplement, testified that in describing the formula to be used in determining whether the various propositions would

13. The so-called newspaper supplement was prepared by Dr. Richard B. Roeder, a member of the faculty of Montana State University and also a member of the Constitutional Convention. The material was checked for "accuracy, style, and objectivity" by three other members of the Convention. It was partially financed by Community Services Program, Title I of the Higher Education Act of 1965, with the state providing office expense and state employees furnishing services; and supplementary funding was provided by Concerned Citizens for Constitutional Improvement (a private group of Montana citizens). While widely distributed, it was not mailed to all voters and was not an official publication.

be adopted, he was trying to reflect what he "interpreted to be the dominant opinion" expressed by the Convention's lawyer delegates. Excerpts from the debate in the Convention confirm this interpretation.

Finally, plaintiffs refer to an "Analysis of Convention Enabling Act Proposed by the Montana Constitutional Revision Commission", which contains the following:

> "The majority for ratification: ('a majority of the electors voting at the election') necessitates the holding of a 'special election' on the same day as the general election, instead of making the ratification part of the general election. Since twenty-five (25) percent of the electors who vote in general elections do not vote on constitutional questions, if the proposals of the convention were placed on the general election ballot they would almost certainly not receive the vote of a majority of the electors voting at the election."

There is no suggestion that any publication or statement, either official or unofficial, was intended to misrepresent any facts or deceive or mislead the voters. The official ballot and publication followed the language of the existing constitution. The other statements at most contained an erroneous interpretation of an ambiguous provision in the Montana Constitution—an interpretation deemed correct by two of the five justices of the Montana Supreme Court.

In no document was there any advice or suggestion that the electors should not vote on the proposed constitution. On the contrary, the unofficial as well as the official publications urged a vote on all four issues. Additionally the newspaper supplement and other unofficial statements cautioned the electors that if they did not vote on the constitution (or any of the other issues) they would aid in its defeat. While this interpretation of the language in the existing constitution was subsequently held erroneous, it was made in good faith and was not an unreasonable interpretation when it was made. In any event, it is clear that all electors who were in fact opposed to the proposed constitution could have expressed their disapproval by voting against it.

■ This is not a case where any electors were deprived of a right to vote [14] or where there was any debasement or dilution in their votes.[15] Nor is it a case where the voters were misled with respect to the content or meaning of any of the issues submitted to them.[16] The 7,302 electors clearly had a right and opportunity to vote on the proposed constitution and in fact were urged to do so.[17]

14. The cases upon which plaintiffs rely are inapposite. In Harper v. Virginia State Board Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Court held that a state's conditioning the right to vote on the payment of a fee or tax violated the Equal Protection Clause of the Fourteenth Amendment. In Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), it was held that a state cannot deny the ballot to a bona fide resident merely because he is a member of the Armed Forces. In Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), the Court held unconstitutional a law limiting the right to vote in school district elections to property owners or parents of children enrolled in the local public schools. In all of these cases the electors in question were *deprived* of the right to vote.

15. As the Supreme Court held in Reynolds v. Sims, *supra*, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." 377 U.S. at 555, 84 S.Ct. at 1377.

16. We agree with the statement in Kohler v. Tugwell, *supra*, that "the state may not mislead its voters to the extent that they do not know what they are voting for or against." 292 F.Supp. at 982. That is not the case here. The electors were clearly advised what they were voting for or against.

17. Except for plaintiff Garrettson and his wife, there is no evidence regarding the reasons the 7,302 electors failed to vote on the proposed constitution. As Garrettson suggested in his deposition, they may have failed to vote "for any number of reasons".

If, under these circumstances, any electors were in fact misled, they were simply mistaken as to the effect of their abstention from voting and not deprived of any right or opportunity to vote in violation of Article IV, Section 4 of the Constitution of the United States, the Fourteenth Amendment to the Constitution, or the Voting Rights Act of 1965 (42 U.S.C. § 1973).

The motion to dismiss accordingly has been granted.