David LUCAS, et al., Plaintiffs,

v.

Judy TOWNSEND, et al., Defendants.

Civ. A. No. 88–166–1–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

June 7, 1989.

Neil Bradley, Atlanta, Ga., for plaintiffs.

W. Warren Plowden, Ed. S. Sell, Jr., Macon, Ga., and Della Wager Wells, Atlanta, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

As a part of the general presidential election conducted on November 8, 1988, the voters of Bibb County, Georgia approved a twenty-nine million dollar ($29,-000,000.00) bond issue destined to pay for the following improvements in the Bibb County school system:

(1) air conditioning existing schools;

(2) constructing a new north-west Bibb County high school with a proposed approximate ratio of 50% white students and 50% black students; and

(3) renovating Northeast High School for its use as a magnet high school.

Both preceding and after the November 8th general election, plaintiffs failed to convince a three-judge district court, convened in accordance with 28 U.S.C. § 2284(b), that Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, requires approval by the Attorney General of the United States of the county commission's and county school board's decision to submit the twenty-nine million dollar bond issue to the electorate as a single question rather than to submit to the voters each of the three component parts of the proposal for their separate approval or disapproval. *See Lucas v. Townsend,* 698 F.Supp. 909 (M.D.Ga. 1988)[1]; *Lucas v. Townsend,* Slip Op. No. 89–166–1–MAC (WDO) (May 16, 1989).

---

**1.** Section 5 of the Voting Rights Act requires that certain "changes affecting voting" be precleared by the Attorney General of the United States prior to their implementation. The three-judge panel held that the Bibb County school board's exercise of its discretion in formulating questions for bond referendums was not a change affecting voting. Further, the court held

Having failed to prevail on their Section 5 claim, plaintiffs now seek to persuade this court of one judge that, pursuant to Section 2 of the Voting Rights Act, the same conduct found not to be a standard, practice, or procedure affecting voting by a three-judge court has suddenly been transformed by Section 2 into such a standard, practice, or procedure. Arguing that Section 2 coverage is broader than coverage under Section 5, plaintiffs contend that the conduct of defendants in this case, that is, the board's exercise of its discretion in combining the school improvement proposals into one question rather than into several questions, is a standard, practice, or procedure which has prevented individuals in the black community from casting an effective vote.[2]

*Discussion*

*Background*

■ O.C.G.A. § 20–2–430 enables county school boards to seek the issuance of bonds upon their determining that the incurrence of such debt is in the best interests of education in the county. That statute provides that the election shall be called and held in the manner prescribed by O.C.G.A. § 36–82–1, a section which describes in de-

tail the notice and other requirements applicable to such issues. In ruling upon challenges to elections held pursuant to the forerunners to these and other statutes, Georgia courts have established the following principle:

> If it can be said that the proposed improvements are not naturally related or connected, then it is clear that separate submissions are required; if, on the other hand, the several parts of the project are plainly so related that, united, they form in fact but one rounded whole, it is equally clear that they may be grouped together and submitted as one proposition.

*Miles v. State of Georgia,* 96 Ga.App. 610, 614, 101 S.E.2d 173, 176 (1957) (citations omitted); *see Berrie v. State,* 119 Ga.App. 148, 166 S.E.2d 631 (1969); *compare Rea v. City of LaFayette,* 130 Ga. 771 772, 61 S.E. 707, 708, (1908) ("two or more *separate and distinct propositions* cannot be combined into one and submitted to the voters of a county or a municipality as a single question, so as to have one expression of the voter answer all of them.") (emphasis added).

The bond issues submitted to the electorate in both *Miles* and *Berrie* each involved

---

that "the form or structure of a question on a bond referendum is not a standard, practice or procedure affecting voting. The discretionary decision to submit one or more questions to the electorate is one properly left to the political process." *Lucas,* 698 F.Supp. at 912.

2. Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973*l*(c)(1) defines "vote" or "voting" for purposes of sections 2 and 5. It reads as follows:

(c)(1) The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

*See also* 28 C.F.R. § 51.2.

**528**

numerous projects for improving the respective county school systems as a whole.[3] Clearly, the bond issue submitted to the voters of Bibb County on November 8th involved various proposals for the improvement of the Bibb County school system plainly so related that, united, they form in fact but one related whole. Thus, pursuant to Georgia law, those proposals may be grouped together and submitted as one proposition. *See Miles, supra.*

*Applicable Law*

■ With the above discussion as background, the court now considers plaintiffs' Section 2 allegations. "The essence of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2764–65, 92 L.Ed.2d 25, 44 (1986). In evaluating a plaintiff's Section 2 claim, a court must first determine whether the challenged conduct or activity is of a type encompassed by the Voting Rights Act, that is, whether the challenged conduct constitutes a standard, practice, or procedure which affects voting.[4] *See generally,*

3. For example, the bond issue in dispute in *Miles* involved a proposal to finance improvements in the Bacon County, Georgia school system, and the use of the funds derived from the sale of the bonds was explained as follows: [The funds derived from the sale of the bonds would be] for the purpose of providing funds to build, construct and equip new educational facilities such as school buildings, libraries, auditoriums, cafeterias, gymnasiums, athletic fields and buildings, and structures useful in connection therewith, adding to, improving and equipping existing properties and facilities of the Bacon County School System and acquiring the necessary property therefor and paying expenses incident thereto. *Miles,* 96 Ga.App. at 613, 101 S.E.2d at 176.

4. Neither the statutes (sections 1973 and 1973c) nor the regulations promulgated pursuant to section 1973c, *see* 28 C.F.R. §§ 51.1, *et seq.,* defines a standard, practice, or procedure as those terms are employed in section 1973. *See Dougherty County No. 1,* 439 U.S. at 37, 99 S.Ct. at 371–72, 58 L.Ed.2d at 277. 28 C.F.R. § 51.13 enumerates examples of "changes affecting voting," most of which relate to practices or procedures pertaining to (1) qualifications, eligibility, or registration for either voting or running for office, (2) boundaries for representative districts, voting precincts or voting units, (3) locations of polling places, and (4) methods of determining the outcome of elections. Only section 51.13(j), which concerns changes "affecting the necessity of or methods for offering issues and propositions for approval by referendum," appears at all relevant to the matter before this court. This court has been unable to discover, and the parties in their pleadings have failed to include, cases interpreting this section. However, as illustrative of the types of conduct or activities which courts have found to constitute standards, practices, or procedures with respect to voting, the court includes the following summary of "changes" which the Supreme Court has found to be covered under Section 5 of the Voting Rights Act. This summary is contained in *NAACP, Dekalb County Chapter v. State of Georgia,* 494 F.Supp. 668, 678 (N.D.Ga. 1980).

—a change from district to at-large voting for county supervisors, *Allen v. State Board of Elections, supra,* 393 U.S. at 569, 89 S.Ct. at 833–34;

—a change from electing to appointing an important county officer in certain counties, *Allen v. State Board of Elections, supra,* 393 U.S. at 569–70, 89 S.Ct. at 834;

—an amendment to balloting procedure which provides that "no person who has voted in a primary election may thereafter be placed on the ballot as an independent condidate in the general election," *Allen v. State Board of Elections, supra,* 393 U.S. at 570, 89 S.Ct. at 834;

—a new procedure for casting write-in votes, *Allen v. State Board of Elections, supra,* 393 U.S. at 570, 89 S.Ct. at 834;

—a change in the location of polling places, *Perkins v. Matthews, supra,* 400 U.S. at 387, 91 S.Ct. at 436;

—municipal annexations, *Perkins v. Matthews, supra,* 400 U.S. at 388, 91 S.Ct. at 437;

—the change from ward to at-large elections of city aldermen, *Perkins v. Matthews, supra,* 400 U.S. at 394, 91 S.Ct. at 439–40;

—a state statute which staggered the terms of the three members of a county Board of Commissioners of Roads and Revenues, *Berry v. Doles,* 438 U.S. 190, 191, 98 S.Ct. 2692, 2694, 57 L.Ed.2d 693 (1978);

—a city's decision to change from an aldermanic system of government to a system in which councilmen are elected at large, *United States v. Board of Commissioners of Sheffield, Alabama, supra,* 435 U.S. at 137–38, 98 S.Ct. at 982–83; and

—a rule by a county board of education requiring employees to take unpaid leaves of absence while campaigning for public office, *Dougherty County, Georgia Board of Education v. White, supra,* 439 U.S. at 47, 99 S.Ct. at 377.

*Dougherty County, Georgia, Bd. of Education v. White, ("Dougherty County No. 1 ")*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978) (holding that a local school board's rule regarding leave without pay for employees desiring to seek elected office and to serve in that capacity was a standard, practice, or procedure affecting voting); *Delgado v. Smith*, 861 F.2d 1489 (11th Cir.1989) (holding that the Voting Rights Act does not reach the activities of private citizens in their petition efforts to place a referendum on the ballot); *see also White v. Dougherty County Bd. of Education ("Dougherty County No. 2 ")*, 579 F.Supp. 1480 (M.D.Ga.1984), *aff'd*, 470 U.S. 1067, 105 S.Ct. 1824, 85 L.Ed.2d 125 (1985) (holding that individual personnel decisions regarding employee's request for leave without pay to serve in elected capacity was not a standard, practice, or procedure with respect to voting). In considering whether the conduct alleged in this case is a standard, practice, or procedure with respect to voting, the court is cognizant both that the phrase "standard, practice, or procedure" must be given the broadest scope possible, *Allen v. Board of Elections*, 393 U.S. 544, 566–67, 89 S.Ct. 817, 832–33, 22 L.Ed.2d 1, 17–18 (1969), and that " 'voting' includes 'all action necessary to make a vote effective.' " *Id.* at 565–66, 89 S.Ct. at 832, 22 L.Ed.2d at 17, citing 79 Stat. 445, 42 U.S.C. § 1973*l* (c)(1).

Because of an absence of authority on the subject, *see supra* note 4, and because the views of the Attorney General regarding the scope of the Voting Rights Act are entitled to particular deference, *see Dougherty County No. 1*, 439 U.S. at 39, 99 S.Ct. at 372–73, 58 L.Ed.2d at 278, the three-judge panel, during the prior Section 5 litigation, invited the United States to submit a brief as *amicus curiae*. Therein, commenting upon 28 C.F.R. § 51.13(j), the United States stated that "[i]t is unquestioned that the 'method of offering issues and propositions for approval by referendum' is such a standard, practice or procedure that, if changed, is subject to Section 5 review." Brief for the United States as *Amicus Curiae ("Amicus " Brief")*, pp. 13–14, citing

28 C.F.R. § 51.13(j). However, the United States continued as follows:

Here, the facts of record would tend to suggest that the defendants' discretionary decision to present the voters with a single vote on the entire bond project is not the kind of change subject to preclearance. *Selecting a number of projects to be financed under one bonding authority would seem to be a normal legislative decision unrelated to the process of holding elections.* It is essentially the same kind of determination as the amount of bonded indebtedness required for a project, the interest rate the board is willing to pay or the term of the bonds.

*Amicus* Brief, pp. 16–17 (emphasis added).

■ The somewhat inconsistent statements made by the Attorney General evidence both the novelty of plaintiffs' argument and the difficulty of the question presented. However, upon consideration, this court finds implicit in the Attorney General's comments the idea that the "methods" brought within the meaning of 28 C.F.R. § 51.13(j) are not those discretionary decisions made by properly elected legislative officials "in the best interests of education"; instead, the regulation refers to those barriers, be they subtle or obvious, which obstruct the paths leading to the registration of voters, the casting of votes, the tabulation of votes and the requirements for election or passage, *i.e.*, approval by majority vote, or by plurality vote, or by a two-thirds margin.

The general idea stated just above finds support in the legislative history developed in regard to the 1982 amendments to the Voting Rights Act. *See generally*, Senate Rep. No. 97–417, 97th Congress, 2nd Session, pp. 1–43, *reprinted in* 1982 U.S.Code Cong. & Ad.News, pp. 177–221 (citations hereafter will be to pages in 1982 U.S.Code Cong. & Ad.News). The original intent of Section 2 of the Voting Rights Act of 1965 was to ban " 'any kind of practice ... if its purpose or effect was to deny or abridge the right to vote on account of race or color.' " 1982 U.S.Code Cong. & Ad.News, p. 194 (footnote omitted), quoting Attorney

General Katzenbach. "[S]ection 2 protects the right of minority voters to be free from election practices, procedures or methods, that deny them the same opportunity to participate in the political process as other citizens enjoy." *Id.* at 206. Congress noted that the vast majority of Section 2 cases have "dealt with electoral system features such as at-large elections, majority vote requirements and districting plans." *Id.* at 207; *see e.g. Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (*en banc*), *aff'd on other grounds sub nom East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).[5]

Each of the cases mentioned, discussed, or noted above addresses a standard, practice, or procedure which clearly impacts a minority individual's access to and participation in the electoral process. Those cases must be contrasted with the alleged standards, practices, or procedures in *Dougherty County No. 2, supra; Delgado v. Smith, supra; Burger v. Judge,* 364

F.Supp. 504 (D.Mont.1973), *aff'd,* 414 U.S. 1058, 94 S.Ct. 563, 38 L.Ed.2d 465 (1973); and *Kohler v. Tugwell,* 292 F.Supp. 978 (E.D.La.1968), *aff'd* 393 U.S. 531, 89 S.Ct. 879, 21 L.Ed.2d 755 (1969). In *Dougherty County No. 2,* though plaintiff John White's claim was based upon Section 5, the three-judge panel's decision hinged upon whether certain actions taken by the school board constituted a standard, practice, or procedure.[6] The actions referred to involved various decisions made by the Dougherty County school board either authorizing or refusing to authorize leave without pay for school employees who wished to campaign for and serve in certain elected positions. In one instance, the panel determined that the school board's decision "did not constitute a 'standard, practice or procedure' pertaining to employee absence. It was nothing more than an individual personnel decision." *Id.* at 1491–92 (footnotes omitted). A second decision by the school board was found not to be a standard, practice, or procedure because in light of its conditional nature it failed to establish "a precedent on which the affected employees and others may

**5.** Congress emphasized, however, that "section 2 remains the major statutory prohibition of all voting rights discrimination. It also prohibits practices which, while episodic and not involving permanent structural barriers, results in the denial of equal access to any phase of the electoral process for minority group members." 1982 U.S.Code Cong. & Ad.News, p. 207.

Footnote 119 of the Senate Report, in illustration of the scope of Section 2, states as follows:

This aspect of the statute's scope is illustrated by a variety of Section 2 cases involving such episodic discrimination. For example, a violation could be proven by showing that the election officials made absentee ballots available to white citizens without a corresponding opportunity being given to minority citizens. *See Brown v. Post,* 279 F.Supp. 60, 63–64 (W.D.La.1968). Likewise, purging of voters could produce a discriminatory result if fair procedures were not followed, *Toney v. White,* 488 F.2d 310 (5th Cir.1973), or if the need for a purge were not shown or if opportunities for re-registration were unduly limited. Administration of an election could likewise have a discriminatory result if, for example, the information provided to voters substantially misled them in a discriminatory way. *United States v. Post,* 297 F.Supp. 46, 50–51 (W.D.La.1969).

1982 U.S.Code Cong. & Ad.News, p. 208.

Two additional cases further illuminate the scope of Section 2. In *Brown v. Dean,* 555 F.Supp. 502 (D.R.I.1982), the court held that "the location and accessibility of a polling place have a direct effect on a person's ability to exercise his franchise." *Id.* at 505, citing *Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). The court found a violation of Section 2 and ordered the polling place relocated. In *Miss. State Chapter Operation PUSH v. Allain,* 674 F.Supp. 1245 (N.D.Miss.1987), the court identified the following voter registration laws as practices in violation of Section 2: (1) the state's failure to make certain amendments to Mississippi's election laws retroactive to that category of voters who had registered with a county registrar prior to August 3, 1984; (2) the state's failure to mandate deputization of all municipal clerks as deputy county registrars; and (3) the state's failure to require satellite registration on a uniform statewide basis, thus hindering the ability of minority members to participate in the political process. *Id.* at 1268.

**6.** The court noted as follows: "Assuming that this court finds that any such standard, practice or procedure was adopted, the second question to be answered is whether or not it is 'with respect to voting....'" *Dougherty County No. 2,* 579 F.Supp. at 1490.

rely...." *Id.* at 1492. Finally, the three-judge court found that, despite the defendant school board's own characterization of its decision as a policy on political leave, "the board in reality decided not to allow its employees who are elected to public office greater time away from the job than they and all other employees are otherwise allowed." *Id.*[7]

In *Delgado v. Smith, supra,* the Eleventh Circuit considered whether citizen initiative petitions come within the Voting Rights Act. The court stated that "[t]here is no question that the sole purpose of [the Voting Rights Act] was to ensure the integrity of the registration and voting process by eradicating barriers which had previously prevented blacks from voting." *Delgado,* 861 F.2d at 1492. The court cited with approval a decision which found the petition process too far removed from the voting booth to fall under the Act. *Id.* at 1493, citing *Zaldivar v. City of Los Angeles,* 590 F.Supp. 852 (C.D.Cal.1984), *rev'd on other grounds,* 780 F.2d 823 (9th Cir. 1986). The Eleventh Circuit panel concluded that "the history of the Act, the stated intention of Congress, and the relevant case law persuade us that the Voting Rights Act could not properly be applied to the case before us." *Id.* at 1493.

In *Burger v. Judge, supra,* a three-judge panel considered the merits of plaintiffs' contentions that the citizens of Montana, in voting on four propositions submitted to the electorate by a Constitutional Convention, had been misled as to the effects of their votes by (1) the official ballot, (2) an official publication mailed to all voters, (3) a newspaper supplement, (4) an analysis prepared by the Constitutional Convention Commission, (5) the debate during the Constitutional Convention, and (6) a particular state statute. *Burger,* 364 F.Supp. at 508–09. The court, after a discussion of plaintiffs' arguments, stated that "[i]n any event, it is clear that all electors who were in fact opposed to the proposed constitution could have expressed their disapproval by voting against it." Continuing, the court stated as follows:

> This is not a case where any electors were deprived of a right to vote or where there was any debasement or dilution in their votes. Nor is it a case where the voters were misled with respect to the content or meaning of any of the issues submitted to them. The 7,302 electors clearly had a right and opportunity to vote on the proposed constitution and in fact were urged to do so.

> If, under these circumstances, any electors were in fact misled, they were simply mistaken as to the effect of their absention from voting and not deprived of any right or opportunity to vote in violation of Article IV, Section 4 of the Constitution of the United States, the Fourteenth Amendment to the Constitution, or the Voting Rights Act of 1965 (42 U.S.C. § 1973).

*Id.* at 511–12 (footnotes omitted).

Finally, in *Kohler v. Tugwell, supra,*[8] a three-judge panel heard plaintiffs' claim that "the designation of the amendment as it appeared on the state ballot misled voters. Hence, they contend that those who voted in favor of the enactment were deprived of their right to vote...." *Kohler,*

---

7. The court summarized as follows:

Viewed from every angle and in the brightest light of the Supreme Court's broad interpretations of the words "standard, practice, and procedure," this board's refusal to alter its neutral personnel policies to accommodate this employee elected office holder does not possibly constitute a Section 5 "standard, practice, or procedure."

\* \* \* \* \* \*

There having been no "standard, practice, or procedure" enacted or sought to be administered, it is unnecessary to consider whether or not the conduct of the defendant board was "with respect to voting."

*Id.* at 1493 (footnote omitted).

8. The plaintiffs in *Kohler* were proceeding under the United States Constitution, Article 4 § 4 and Amendment 14. The Voting Rights Act was not at issue in the case. However, the discussion in *Kohler* sheds some light on the matter before this court. Additionally, the court notes that the Fourteenth Amendment to the Constitution of the United States is one of the sources of the Voting Rights Act. *See United States v. Marengo County Commission,* 731 F.2d 1546, 1555 (11th Cir.1984), *appeal dismissed, cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984).

292 F.Supp. at 979. The panel agreed with plaintiffs that the amendment was phrased in a manner "so turgid that it would be difficult to say that any ballot designation could describe it accurately." *Id.* at 980. Quoting *Reynolds v. Sims,* 377 U.S. 533, 554, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506, 523 (1964), the court noted that "the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Kohler,* 292 F.Supp. at 981. The *Kohler* panel went on to state as follows:

> However, a federal court must not interfere with the internal affairs of a State unless it is necessary to do so to protect those rights guaranteed every citizen by the Federal Constitution. The procedure followed by Louisiana does not deprive the plaintiffs of Due Process for it is sufficient that Louisiana's voters were informed by the ballot of the subject of the amendment, were given a fair opportunity by publication to consider its full text, and were not deceived by the ballot's words.

*Id.* (footnote omitted).

### Analysis

■ Quite clearly, the issues raised by plaintiffs in the case before this court are not identical to those issues discussed in the cases above. However, the extensive examination of the relevant statutory, regulatory and case law has convinced this court that the conduct attacked by plaintiffs in this case is not a standard, practice, or procedure as those terms are understood. First, it seems clear to this court that the Voting Rights Act addresses the right to vote; it does not address the deliberative process of local or state boards. Second, plaintiffs have presented no evidence to this court of any policy or mathematical formula by which or pursuant to which the school board of Bibb County arrives at the manner in which any particular proposal decided to be in the best interests of education should be submitted to the electorate. Instead, like the situation presented in *Dougherty County No. 2,* the evidence suggests that the decision to submit the proposed improvements to the voters in one question rather than in two or more questions was a singular decision premised upon the facts of this particular situation. That the decision was to some degree premised upon political realities does not undermine that decision; nor does it make that decision in some fashion sinister or manipulative. Elected bodies like the school board of Bibb County, comprised of individuals nominated and elected in presumably valid elections in which all voters had an equal opportunity to participate, must be afforded some freedom to engage in the traditional political tools of consensus-building and compromise to effectuate comprehensive plans for school and community development and improvement. Government in the United States, be it federal, state or local, takes the form of representative democracy. That does not mean, of course, that representatives once elected are free to disregard the law; however, the functioning of a representative democracy must be contrasted with the functioning of a pure democracy. Representatives are elected to pursue an agenda which benefits the community at large. They may be re-elected or cast out of office, depending upon their performance or lack thereof. This scheme of government does not contemplate a vote by every individual on every single issue in isolation or in the abstract. Some trust and some faith must be placed in the elected representatives of the people. The Georgia cases discussed *supra* recognize that principle and establish boundaries beyond which that trust is suspect. And as those cases demonstrate, Georgia law provides various mechanisms by which the citizens may challenge the conduct of their representatives in this regard.

■ To accept plaintiffs' position in this matter is to invite chaos. Any and all matters which are to be submitted to the electorate for its approval or disapproval, be that matter a proposal by a local board for a bond issue to construct a new high school or be it an amendment proposed by a state legislature, would be subject to

challenge under the Voting Rights Act.[9] This court finds plaintiffs' position unfounded either in law or in logic. Section 2(a) of the Voting Rights Act "prohibits all states and political subdivisions from imposing any qualifications or prerequisites to voting, or any standards, practices, or procedures which result in the denial or abridgment of the right to vote...." *Thornburg v. Gingles*, 478 U.S. at 43, 106 S.Ct. at 2762, 92 L.Ed.2d at 42. However, Section 2(b) expressly cautions that "noth-

---

**9.** Language from *Dougherty County No. 2* is informative on this point:

> In response defendant school board argues that plaintiff in effect is suggesting that under the Voting Rights Act the Attorney General or the United States District Court for the District of Columbia must pass judgment upon every board of education decision to grant or withhold leave without pay to an elected official to attend to the duties of his office. If this be true, the defendant board suggests the Voting Rights Act has removed the board's authority to do anything without going to Washington for approval.

*Dougherty County No. 2*, 579 F.Supp. at 1490, citing *Dougherty County No. 1*, 439 U.S. at 54, 99 S.Ct. at 380, 58 L.Ed.2d at 287 (Powell, J., dissenting). The basis of the concern expressed by the three-judge panel above has come to pass in the case *sub judice*. The following discussion, elicited during the hearing on plaintiffs' Section 5 claim, illustrates that the concern expressed by the three-judge panel in *Dougherty County No. 2* was well founded.

JUDGE HILL: Well now, let me be sure I understand your contention. Would that apply no matter how they came down if they—if they discussed what to put on, then whatever answer they came up with would be a Voting Rights Act change? Let me be a little clearer. Suppose they had come up with the idea, "We shall put each of these separate," that would be a change?

MR. BRADLEY: Yes, Your Honor.

JUDGE HILL: And if they'd said, "We will put each school to be air conditioned separately," that'd be a change and if they said, "We'll put them all together," that would be a change so however they decided to put the question would have to be precleared?

MR. BRADLEY: When they're deciding what questions to put on the ballot, yes, Your Honor. To back up from that to perhaps more clearly explain my position, if they debate whether or not to air condition schools and decide they're going to air condition half of them—

JUDGE HILL: Suppose they decide to air condition all of them but they decided the way to put this would be to put to the voters each as a separate bond issue, so many dollars to air condition School "A" and so many dollars for School "B" as a separate question and "C" and all the rest, that would be subject to preclearance?

MR. BRADLEY: Yes, Your Honor.

JUDGE HILL: And if they decided to air condition all the schools and put that question, "Shall we air condition all the schools?" that would require preclearance?

MR. BRADLEY: Yes, Your Honor.

JUDGE HILL: So there would be no question that could be put in a bond referendum anywhere in any jurisdiction covered by the Act that would not have to be precleared by the Department of Justice, would there? Could you conceive of one?

MR. BRADLEY: Because bond issues are not regularly scheduled elections, I don't believe I can conceive of one.

JUDGE HILL: Well now, I'm assuming the date issue now is out of the window, that's been precleared?

MR. BRADLEY: Yes, Your Honor.

JUDGE HILL: So even if you had—if the Constitution of a state established the dates upon which bond issues would be put, the construction of the question would still be subject to preclearance, is that right?

MR. BRADLEY: Yes, Your Honor.

JUDGE FITZPATRICK: Let me ask you this question, what if we're dealing with one school and you want to—the School Board says, "Well, we want to air condition this school and we also want to build a gymnasium there at this school and while we're doing that, we need to enlarge the library to make the library more attractive and do three or four different projects all on this—in this same school," would you have to separate each one of those projects, for instance, to give people [a chance] to say, "Well we want to air condition it but we don't want the new gym. We don't think we ought to refurbish the library," or "build a new teacher's lounge," or whatever, is that—am I off in the wild blue yonder with this scenario?

MR. BRADLEY: No, Your Honor. And my answer is the Board does not have to separate it; it can make whatever choice it wants to, to have five bond issues for each particular facility or to have one.

JUDGE FITZPATRICK: Oh, you could have a bond issue to say to—dealing with Northwest School or Southeast School or whatever, $25,000,000 to air condition, build a gym, refurbish the auditorium, all of that, and you could—you vote for it or against it?

MR. BRADLEY: The Board could do that.

JUDGE FITZPATRICK: And that would be okay?

MR. BRADLEY: They would still have to submit it for preclearance under the Voting Rights Act.

Transcript of November 1, 1988, Hearing Before Three-Judge District Court, pp. 9-12.

ing in [§ 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.* at 43, 106 S.Ct. at 2763, 92 L.Ed.2d at 42 (brackets in original). This statutory language establishes a boundary to the concept of "vote effectiveness"; by analogy, Section 2 clearly does not establish a right to have those proposals which must be submitted to the electorate phrased in such a way that any particular group is ensured of success. Yet that is what plaintiffs desire—an opportunity to isolate certain issues which are allegedly favorable to a particular group at the expense of a comprehensive plan which elected officials have formulated for the overall good of the community.

The reapportionment decisions of the Supreme Court[10] support this court's understanding of the term "vote effectiveness" as that term relates to the concept of "dilution." Clearly, political units may not structure voting districts in such a manner as to make impossible the election of minority candidates. The matter before this court, however, is qualitatively different from such a situation. Here, each individual, black and white, had an opportunity to cast an effective vote for or against a comprehensive school improvement/development plan. The matter was thoroughly discussed in the community. No voter was misled. This court cannot find that "vote effectiveness" means a right to vote on each individual issue considered by its elected officials.

This court reiterates what the *Burger* court recognized earlier: every individual qualified to vote in the November 8th election had the opportunity to express his or her approval or disapproval of the bond issue. Those voters, like the school board itself, had to weigh the pros and cons of the proposal as a whole. Then, based on their understanding of the merits of that proposal, the voters expressed their preference, albeit by a narrow majority, to support a comprehensive scheme of improvement in the Bibb County school system. Such is the way in which the political system functions.

In conclusion, this court determines that the exercise of discretion by validly elected local board officials in determining the number of questions to be submitted to the electorate for its approval or disapproval at the ballot box is not a standard, practice, or procedure. Alternatively, the court finds that even if such exercise of discretion was a standard, practice, or procedure, such practice does not affect voting. The manner in which the proposal was structured had and has absolutely no bearing upon the qualification of any individual to vote, the ability of any individual to register to vote, the opportunity of any individual to cast his or her vote, or the manner in which any individual's vote was tabulated. Plaintiffs' claim as premised upon Section 2 of the Voting Rights Act is therefore DENIED.[11]

SO ORDERED.

---

**10.** *See Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973).

**11.** The court's resolution of this matter negates the need to consider the "results" of the alleged standard, practice, or procedure. The 1982 amendments to the Voting Rights Act re-instituted the "results" test, making clear that a Section 2 violation could be proved by showing discriminatory effect alone. *See Thornburg,* 478 U.S. at 35, 106 S.Ct. at 2758, 92 L.Ed.2d at 37. The court is aware that plaintiff has filed certain information regarding voting patterns in the bond issue and other elections. Plaintiff has also filed voluminous documents entitled plaintiffs' request for judicial notice of historic racial discrimination. The court has examined those pleadings; however, those documents are pertinent to the "results" aspect of this case, an issue which this court did not reach.